JOHN N. VARGO et al.

*v.*

ALEXANDER VAJO et al.

[Submitted April —, 1909. Decided May 20th, 1909.]

1. Evidence, in a proceeding to prevent the property of a religious society from being diverted from its original use, *held* to show that a meeting of the society, called to determine whether the society should continue to affiliate with the church organization with which it had formerly affiliated, or should connect itself with another society, was regularly called, and that all the proceedings which took place at such meeting were regular and in accordance with the course and practice of the society.

2. Where a meeting of a religious society is held to determine whether the society shall longer affiliate with the branch of the church with which it had formerly affiliated, or shall connect itself with another, and it is unanimously decided at that meeting to connect itself with another society, and no appeal is taken from such action to any higher judicatory of the church, such action is final, and a subsequent meeting of the society cannot disturb the decision.

3. Evidence, in a proceeding to prevent the diversion of church property from its original use, *held* to show that the Hungarian Evangelical Reformed Congregation of Trenton is only subject to the supervision of higher church authority in ecclesiastical matters, and that it has full control over its property, and cannot be restrained from reincorporating as the Magyar Reformed Church of Trenton, and transferring its property to the latter church and loaning money and placing a mortgage on such property.

4. Where a meeting of a church society is regularly called and conducted, and the society determines at such meeting to terminate its connection with its superior church body and affiliate with another church, there being nothing to prevent such action in its charter, members of the society who do not agree with the majority lose any right which they may possess to bring an action to prevent the society from carrying out its resolution by failing promptly to commence an action, as laches will prevent them from securing favorable consideration in a court of equity.

On final hearing on bill, answer, replication and proofs.

*Messrs. Bird & Blackman,* for the complainants.

*Mr. Alfred F. Skinner* and *Mr. Morris Cukor* (of the New York bar), for the defendants Vajo and others.

*Mr. Foster M. Voorhees,* for the Magyar Altalanos Hitelbank of Buda Pesth.

HOWELL, V. C.

The bill in this case is filed for the purpose of obtaining relief against a religious society incorporated by the name of The Magyar Reformed Church of Trenton, and against its officers, with respect to certain real estate and personal property which the complainants claim have been diverted from their original uses. The facts are voluminous. Some time prior to 1896 a number of Hungarians who resided at Trenton formed a voluntary society for the purpose of religious worship. This society was incorporated in that year by the name of the Hungarian Evangelical Reformed Congregation of Trenton, New Jersey, by the usual certificate signed by five trustees, duly acknowledged and recorded in the office of the county clerk of Mercer county. It was thereby certified that on the 26th day of April, 1896, the Hungarian Evangelical Reformed Church of Trenton, New Jersey, a congregation of christians of the denomination known as the Reformed Church in the United States, assembled at their house of public worship and elected trustees with a view of becoming incorporated according to law. For the first few years its affairs seem to have been satisfactorily conducted. It had

some difficulty when there was a vacancy in procuring regularly-ordained clergymen who were competent to fill the pastorate and at the same time speak the Hungarian language. This class of clergymen could not be found in this country; they had to be brought over from the mother land. Yet the congregation prospered to such an extent that about two years after its incorporation it purchased two tracts of land by two deeds, of which the following are general descriptions. The first deed was made on June 23d, 1898, by Edward Connelly and wife to

"The Trustees of the Hungarian Evangelical Reformed Congregation of the city of Trenton in the county of Mercer and State of New Jersey, a body corporate created and existing under and by virtue of the laws of the State of New Jersey, and being part of and connected with the Reformed Church in the United States."

The other deed was dated on June 25th, 1898, and was made by John Watson and wife to

"The Trustees of the Hungarian Evangelical Reformed Congregation of the city of Trenton, county of Mercer and State of New Jersey, a body corporate, created and existing under and by virtue of the laws of the State of New Jersey, and being part of and connected with the Reformed Church in the U. S."

Later on it acquired two other tracts, one by deed dated April 9th, 1900, made by Carrie W. Satterthwait to "The Trustees of the Hungarian Evangelical Reformed Congregation of Trenton, N. J.," and the other dated April 8th, 1905, made by John E. Wargo to "The Trustees of the Hungarian Evangelical Reformed Congregation of Trenton." These tracts of land were owned by the society at the time of the events hereinafter mentioned. Upon this land the society had in the meantime erected a church edifice and a parsonage, and there were also some other buildings on the premises which were let to tenants.

Prior to and at this time there was in existence a church judicatory called "The Reformed Church in the United States," which had some sort of ecclesiastical jurisdiction over a large number of churches. This judicatory was governed by a set of rules called the Constitution of the Reformed Church in the United States. The Trenton church became affiliated with this

judicatory on September 26th, 1899, and came under the ecclesiastical jurisdiction of the Philadelphia classis thereof, and from that time on for a number of years the Trenton church sent delegates to the annual meetings of the Philadelphia classis. There were many churches affiliated with the Reformed Church in the United States, which were composed of Hungarians, among whom only the Hungarian language was used. These churches petitioned the proper authorities of the Reformed Church in the United States for a direction that they be set off into a classis, to be called the Hungarian classis, but still under the ecclesiastical jurisdiction of the Reformed Church in the United States, and such proceedings were had that a Hungarian classis was organized to which the Trenton church was assigned and with which it became affiliated in June, 1905. This continued to be the situation of the Trenton church until the early part of 1907. It sent its delegates to the meetings of the higher judicatories; it recognized the jurisdiction of the Reformed Church of the United States over it, at least in spiritual matters, and it received annually a contribution from a board of missions which was associated with the Reformed Church in the United States, and was organized for the purpose of assisting its weak churches. This contribution was in the form of an annual addition to the salary of the pastor. The difficulty, however, of procuring properly educated ministers for their church still continued, and it became a subject of rather frequent conversation among the men who formed the consistory of the church and others who were its interested supporters.

There was, during all this time, a church organization in Hungary which was named the Universal Evangelical Reformed Church of Hungary. This appears by the testimony to have been and to be the highest judicatory of a denomination of Hungarian christians. In 1904, Count Joseph Dagenfeld visited the United States in the interest of this Hungarian body, and among the other churches that he called upon was the Trenton church, which he desired to have affiliated with the Hungarian body that he represented; his reason being that the Hungarian church was in a position to supply educated clergymen who spoke the Hungarian language, to the weaker churches in the United

States, and would also make larger contributions toward the support of the worshiping assembly than was being provided by the Reformed church. Little or nothing appears to have been done about the matter until the month of February, 1907, yet Dagenfeld's representations and promises were meantime much discussed by the members of the congregation. In February, 1907, the Rev. Alexander Vajo, who was the incumbent of the pastorate of the Trenton church, received a call from a church in Toledo, Ohio, which had a larger congregation and was perhaps a more important society than the one to which he was ministering. He communicated this fact to several members of his consistory, who casually met at his house on the evening of Saturday, February 16th, 1907. The meeting was purely informal, and is not claimed to have been a meeting of the consistory; but it was decided then and there that the pastor should on the following day, Sunday, February 17th, call a meeting of the consistory at the close of the church services in the afternoon of that day, and should likewise call a general meeting of the congregation to be held on Sunday, March 3d, both meetings, that of the consistory and that of the congregation, being called for the purpose of discussing two things—*first,* the call which the pastor had received from the Toledo congregation, and *second,* the question of dissolving the relations of the church with the Reformed Church in the United States and becoming affiliated with the Universal Evangelical Reformed Church of Hungary, the sole purpose of the latter being to have better facilities for procuring pastors when necessary, and also to obtain a larger degree of support than could be afforded by the agencies of the Reformed church.

On Sunday, February 17th, 1907, the pastor, in accordance with the custom of the church, announced that there would be a meeting of the consistory at the close of the church services. So far as I can see this meeting was regularly called. The by-laws provide that among the duties of the pastor is the duty "to summon the consistorial and congregational meetings and preside over them." There is no other specific by-law or rule on the subject. At that meeting there was a discussion of the matters for which the meeting was called, and it was decided,

without dissent, one at least of the complainants being present, that a general meeting of the congregation should be called, and that the Rev. Ladislaus Bede, who, in some way, represented the Hungarian church, should be invited to make an explanation of the plan of affiliation with that body. On the morning of that day there were posted on the doors of the church a notice, signed by the pastor and the treasurer, who is also called curator, calling a general meeting of the members of the congregation to be held on Sunday, March 3d, 1907, for the purpose, among other things, of discussing the proposition to join the Hungarian society. The meeting was likewise announced from the pulpit and the object of it stated by the pastor. On February 28th, 1907, there was a meeting of the consistory, which likewise appears to have been regularly called. The Rev. Mr. Bede was present. At this meeting it was decided by the consistory, without a dissenting vote, that the congregation should sever its relations with the Reformed church and should become affiliated with the Hungarian church, and that the whole matter should be submitted to the general meeting of the congregation which had already been called for Sunday, March 3d, 1907.

Besides the by-law above quoted there does not appear to have been any written rule in relation to calling meetings of either the consistory or of the congregation; a custom, however, was shown to have been in vogue in the Trenton church since its organization in relation to each. The pastor testified that his custom of calling the consistory together was, at the beginning of the church services to request the members of that body to remain after the service had been concluded, and that the method of calling congregational meetings was, for the consistory to pass a resolution for the purpose, then he, the pastor, would announce the meeting from the pulpit two weeks in advance, and a two weeks' notice was always posted on the front door of the church edifice. The absence from the constitution of the church of a specific method of calling these meetings must have been deemed to be a defect in the laws of the church, for the reason that the new constitution adopted in 1908 contains definite rules on the subject. The practice which was followed, however, is one which is prescribed in article 40 of the church constitution which was

in force at the time for calling meetings for certain objects therein specified. It declares:

"All matters of this kind must first be investigated and determined by the Consistory and then be' submitted for final decision to the congregation, a meeting of which shall be convened for the purpose by the Consistory on some suitable day."

In this case, the matter in question was acted upon at a regularly called meeting of the consistory by a unanimous vote and was then submitted to a general meeting of the congregation to be held on March 3d, which was called by a fair and reasonable notice. In pursuance of the notices given a large number of people who belonged to the congregation assembled after the regular church services on that day, some of the witnesses putting the number as high as three hundred. The pastor explained the situation to the congregation, and, among other things, he stated that he proposed to have the congregation vote on the question of affiliating with the Hungarian church, but that if there was one dissenting voice, so far as he was concerned, he would let the matter drop. .

There is evidence in the case to the effect that everyone of the complainants was present at that meeting, and that when the vote was taken, they voted in the affirmative. I find, as a matter of fact, that when the question was put by the pastor he called upon the people present to vote upon it by rising. When this call was made every person in the room stood up. In order to make sure of the fact the pastor appointed Joseph Horwath, the curator, and John E. Wargo to ascertain for him how the vote stood. They both say that they walked down the aisles between the benches to the rear doors, that they had an opportunity to see, and did see, whether everyone was standing or not; that they returned to the front of the church where the pastor was and reported to him in a loud voice which could be heard all over the church edifice that every person was standing—that is to say, that everyone who was present had voted in favor of affiliating with the Hungarian church. The testimony of the pastor, Mr. Horwath and Mr. Wargo to this effect is corroborated and supported by the testimony of several other witnesses, and

while the complainants contest this position, I am firmly of the conviction that all who were present either voted in the affirmative or remained seated and did or said nothing. After the affirmative vote had been taken the pastor testified that he called for the negative vote, and no one appearing to vote in the negative, he declared the resolution carried. John Bona, one of the complainants, testified that he attempted to speak, but that he was prevented from doing so by the pastor. The pastor explains this incident by stating that Bona did not attempt to speak until the close of the meeting when he was in the act of pronouncing the benediction; then, of course, it was too late. Up to this point, I think, the evidence shows very clearly that the meeting which was supposed to be the decisive meeting, the one held on March 3d, 1907, was regularly called, and that all the proceedings which took place at it were regular and in accordance with the course and practice of the religious body in question. I conclude that the vote was unanimous in favor of the secession from the Reformed Church of the United States. But assuming that the vote was not unanimous and that there was an objection made or a negative vote cast by the six complainants who were members of the congregation, would that be sufficient to invalidate the proceedings taken at the meeting? Assuming that there is a method by which this Trenton church could disconnect itself from the Reformed church and become affiliated with the Hungarian church, must it be upon the consent of every member of the church or by and with the consent of every member of the congregation?

It is very certain that immediately after the meeting objections were made which came to the ears of the pastor and the consistory, and was also called to the attention of the classis, which was the next higher judicatory of the Reformed church. It resulted in another general meeting of the congregation held at the close of the church services on April 7th, 1907. The Rev. Mr. Csutoros, the president of the Hungarian classis of the Reformed church, was present. He had come for the purpose of making explanations and endeavoring to ascertain what were the facts about the secession. For this purpose he put the question to the meeting anew. Four objectors arose, John N. Vargo,

Mrs. Dubos, Mrs. Yatchi and John Bona. This meeting, however, was of no effect on the question at issue. That had already been decided. At a meeting of the whole congregation regularly called, there had been a unanimous vote in favor of the secession from the Reformed church and an affiliation with the Hungarian church, and no appeal was taken from the action of the congregation to any higher judicatory of the church.

The next question that arises is whether the Trenton church had an inherent right to so secede.

The complainants say that when once affiliated with the higher judicatory of the church, there can be no secession by any of the units without the consent of the supervising body. This claim makes it necessary to ascertain what the relations of the two bodies really were. The complainants urge that the certificate of incorporation and the two first conveyances to the corporation record the statement that the Trenton church belonged to the denomination known as the Reformed Church in the United States, and was a part thereof, and was connected therewith. These statements, however, were all made prior to the time when the church was actually received into the Philadelphia classis, and while it was an undoubtedly independent religious society. It has been held, as defendants' counsel has shown by cases cited in their brief, that such a situation creates a mere voluntary connection which may be broken at any time by a majority vote of the church. *Lawson* v. *Kolbenson, 61 Ill. 405; Heckman* v. *Mees, 16 Ohio 584; Miller* v. *Gable, 2 Den. 492.* In *Watson* v. *Jones, 13 Wall. 679,* the supreme court of the United States stated the law to be that where property had been acquired by an independent religious society, the court would not interfere with its disposition of its property. If there is anything in the constitution of the Reformed church which denies the right of secession without the consent of the supervising judicatory, then it would be the duty of this court to follow the ecclesiastical rule and not permit the secession to take place except in accordance with the laws of the church. If, however, there is nothing which prohibits such action on the part of the inferior body this court would not be justified in declaring the secession unlawful for the reason that there was no prohibition of such action. If, again,

the ecclesiastical laws permit this sort of action, then the court will not take cognizance of any proceeding which seeks to restrain the right of the individual church to control its own property. An examination of the constitution of the Reformed Church in the United States discloses the fact that the ecclesiastical judicatories of that church are—*first*, the consistory; *second*, the classis; *third*, the synod; and *fourth*, the general synod; and in relation to these bodies this fundamental law in article 24 provides as follows:

"These judicatories shall take cognizance only of ecclesiastical matters; their power is wholly spiritual; they possess the right of requiring obedience to the laws of Christ and of punishing the disobedient by excluding them from the privileges of the church, but not by the infliction of any civil penalties."

By article 40 the jurisdiction of the consistory, which is the lowest judicatory, is defined. It is as follows:

"To the Consistory as such belongs the choice of delegates to represent it in the higher judicatories of the church and the management and control of the temporal concerns of the congregation. In the calling of a minister, the judging of a minister or other officers of the church. the purchase or sale of property, the Consistory can determine nothing conclusively without the consent of a majority of the congregation present. All matters of this kind must first be investigated and determined by the Consistory and then be submitted for final decision to the congregation, a meeting of which shall be convened for the purpose by the Consistory on some suitable day."

The jurisdiction of the classis does not include the management and control of the church property, but does include whatever concerns the spiritual welfare of the several congregations committed to their' care which does not come within the power of a consistory. They decide cases which are brought before them by appeal or complaint from consistories as well as all cases respecting either ministers or congregations which may arise within their jurisdiction and are regularly brought before them, such as the forming of new congregations, the determining of their boundaries when they are contested, the decisions of controversies between existing congregations, and the forming or dissolving of connections as may be requested or

the classis may deem expedient. The synod and the general synod do not appear to have any jurisdiction over the church property at all. In view of the provisions of the twenty-fourth article of the constitution and the absence of any prohibitory mandate in the fundamental church law, I conclude that the government of the Reformed Church in the United States was not Episcopal or Presbyterian in form, but that it was congregational to the extent that each worshiping unit had the absolute control of its own property, and that its connection with the main body was merely spiritual, disciplinary and doctrinal. The express renunciation of all other connections by the terms of the twenty-fourth article necessarily lead to this conclusion. The two experts in the ecclesiastical law of the Reformed church, who were called as witnesses, both stated that there was not any express rule forbidding secession.

It is argued on behalf of the complainants that the expressions made use of in the certificate of incorporation of the Trenton church, and in the two deeds of conveyance to it, are sufficient in themselves to create a trust in favor of the denomination known as the Reformed Church in the United States. As to the expression in the charter, I think that that was used merely for the purpose of stating what denomination of christians the church members belonged to, and as to the expressions in the deeds, it is quite clear that they were at the time not true, because the Trenton church was not received into the Philadelphia classis of the Reformed church until a considerable time after these deeds had been executed and delivered.

The evidence shows that after the meeting of March 3d, 1907, there was no change whatever in either the form or the substance of the religious teachings or of the doctrines to which the members of the congregation adhered. There was no dismissal of the pastor nor any break in the relations between him and the congregation. The congregation continued its identity unchanged and unbroken, except that the complainants and certain of their friends declined to recognize the change. The main body of the people comprising the congregation continued to worship in the same manner as theretofore, and in all respects the situation was unaltered, except that the congregation con-

sidered itself affiliated with the Hungarian church and no longer with the Reformed church. The case comes within the rule announced by the supreme court in *Pulis* v. *Iserman, 71 N. J. Law (42 Vr.) 408.* There the question was whether there might be lawfully a secession by the Paramus church from the classis of the True Reformed Dutch Church. Mr. Justice Dixon says, in the opinion, that inasmuch as the constitution of the True Reformed Dutch Church contained no explicit declaration on the subject of secession, it must be regarded as permitting that right, and, pursuing the subject, he says: "That the Paramus congregation, when, by unanimous vote, it separated from classis and synod, did not *ipso facto* lose its congregational or corporate character is a proposition supported by the decisions in *Doremus* v. *Dutch Reformed Church, 3 N. J. Eq. (2 Gr. Ch.) 332,* and *Den* v. *Pilling, 24 N. J. Law (4 Zab.) 653,* and if, as we think, it thereby exercised its right of secession, it became an independent congregation. The authority of classis and synod over it being thus terminated, the subsequent attempts of classis to reconstruct that congregation or to transfer its franchises to a new congregation were futile." And the result was that the church which so seceded from the True Reformed Dutch Church was permitted to become a Presbyterian church under the care of the Presbytery of Jersey City.

Much reliance is placed by the complainants on the authority of *Den* v. *Bolton, 12 N. J. Law (7 Halst.) 206.* That case cannot be regarded as any authority for the present one because the chief-justice states in the beginning of his opinion that the case did not require the court to consider or decide what was the effect upon the joint property of a religious society of the withdrawing of the whole or a portion of its members either with or without a change of doctrine and their union with some other religious denomination or their formation of some new sect or some new ecclesiastical arrangement, nor whether those who thus change or withdraw carry with them any portion of the common funds, thus omitting from consideration the very things which are of paramount importance in the case at bar.

Counsel for complainants considered that *Roshi's Appeal, 69 Pa. St. 468,* was decisive of the question of the right to secede.

A careful examination of the case, however, shows that the proceeding was taken for the purpose of enforcing an express trust which was impressed upon the land in question in the deed by which the church took title from the individual who had donated the same and devoted it to a particular use. Whatever is said in that case about the right of the secession must be limited to the particular facts under which that question of law was presented.

After the meeting of April 7th, 1907, nothing was done by either party looking to a reconciliation of their differences. The consistory and trustees then in office remained in office until the midsummer of that year, when a new consistory was elected, which thereafter took steps to carry out the proposed union with the church in Hungary. Meantime the complainants lay still and did nothing to prevent affirmative action on the part of the new consistory and trustees. The things which were done in that direction and for that purpose must have been known to the complainants. Indeed, I can hardly conceive how any important transaction could be had by the prevailing party in relation to church action which could have escaped their vigilance. There is, it is true, no evidence which tends to show that they had actual knowledge of these subsequent transactions, but I think it is fair to assume that they could hardly have taken place without some hint coming to the ears of those objectors.

Up to this time the church was indebted to the Mercer Trust Company, on its promissory note, for a loan of $1,300, and to one Grumholz, on a mortgage, for $1,700, making $3,000 in all; about the midsummer of 1907 the consistory had an opportunity to purchase a piece of land adjoining the church property from Mrs. Martha L. Moore. On August 11th, there was a meeting of the congregation at which the pastor stated that the Moore property could be bought for $5,050, but that in order to make the purchase it would be convenient that the church should procure a loan of $8,000, and so fund the said indebtedness and the cost of the Moore property into one loan; that this loan could be had from the Magyar Altalanos Hitelbank of Buda Pesth, Hungary, one of the defendants to this suit. This purchase and the loan were authorized at that meeting. On September 1st, 1907, at a meeting of the consistory, the pastor reported the purchase

of the Moore property; that $50 had been paid in advance thereon, and that $200 more was paid on August 27th, and that the balance of $4,800 must be paid by the 1st of November; that for the purpose of procuring the loan a new charter would have to be procured which would bind the church to the Hungarian body, and that the property should be transferred to the corporation thus to be organized. In order to effectuate this step the consistory provided for another congregational meeting to be held on September 8th. At this meeting the pastor stated the necessity of a new charter in order to effectuate the loan, and that it would be necessary to transfer the property to the new corporation; he proposed that the scheme be adopted by the congregation, and that five new trustees should be elected to carry out the plan. The congregation unanimously affirmed the plan and elected as trustees, John E. Wargo, John Pandek, Andrew J. Duch, Alexander Kovach and Andrew K. Wargo. I repeat that these public events could hardly have taken place among the Hungarians in Trenton without being heard of by the complainants. They permitted the new charter for a new corporation to be filed on October 3d, and by it the Magyar Reformed Church of Trenton to be organized; they permitted the trustees of the Hungarian Evangelical Reformed Church of Trenton to convey its church property to the Magyar Reformed Church of Trenton by deed dated October 1st, 1907, which was acknowledged and recorded on October 7th, 1907. They permitted the Magyar Reformed Church of Trenton to purchase from Martha L. Moore a tract of land adjoining their property by deed dated October 31st, 1907, for the consideration of $5,-050; and they permitted the Magyar church to borrow from the Hungarian bank, through the agencies of the Hungarian church on bond and mortgage on all their church property, the sum of $8,000, a portion of which was used to pay off the indebtedness to Grumholz and the Mercer Trust Company, and the remainder for the purchase of the Moore property. And I say again that these facts must have been known to the complainants, or some of them, because it is in evidence that they, or perhaps a majority of them, attended the church from time to time and called upon the pastor to assist at their weddings and funerals.

In my opinion, if the complainants ever had any cause of action arising out of the facts in this case they lost their right to bring a suit thereon by their inaction after March 3d, 1907. If they had, or considered that they had, a cause of action arising out of the circumstances of the meeting which was held on that day, they should at once have prosecuted the same, and to delay and permit the important transactions above recited to be closed without so much as making inquiry as to what the defendants intended to do, or what they were doing, is such laches as disentitles them to favorable consideration in a court of equity.

It should perhaps be stated that after the organization of the new corporation (the Magyar church) the identity of the congregation continued; it consisted of the same persons; it was governed by the same rules and adhered to the same doctrines, and was ministered to by the same pastor as formerly.

The defendants also claim that the six complainants have, by their participation in the proceedings complained of, so far acquiesced as that they ought not now to be heard in opposition. John Noai Vargo was a member of the consistory, attended the meeting of February 17th, and there voted to join the Hungarian church; he repeated this action on February 28th, and the weight of the testimony is that he was at the meeting of March 3d and either voted in favor of the secession or remained silent. John Bona was present at the meeting of March 3d and either voted in favor of the proposition then pending or remained seated. The same may be said of John Scoke, of Joseph Kovach, of George Dubos and Andrew K. Duch. There is some denial of these allegations, but the weight of the testimony is in their favor. Indeed, it was said at the meeting of April 7th, when John Noai Vargo expressed his dissent from the action that had been taken, that he had voted for the proposition on March 3d, and he said in response that he had changed his mind. Some of the complainants have either actually or practically withdrawn from the suit. John Scoke says in his testimony that he was not suing, that they only called him to a notary public because he knew how the church was built, but that he did not sign to sue and that he never would sue. Joseph Kovach and Andrew K. Duch have actually withdrawn from the suit by

paper-writings which were put in evidence. Then there is the further fact that these men are mere dummies whose names are being used by the Reformed Church in the United States in an attempt to hold under its jurisdiction the valuable property which the Trenton church has acquired. This appears in the testimony of John Bona. There are many other difficult and important questions in the suit which I do not find it necessary to decide. One is the relation which the five trustees who were elected on September 8th bear to the present organization, it being argued, on the part of the Hungarian bank, that the case of *Doremus* v. *Dutch Reformed Church, 3 N. J. Eq. (2 Gr. Ch.) 332,* goes to the extent of holding them in office, whatever may happen to the other branches of the transaction. Another question is whether the church property of the Trenton church was transferred to the Magyar church by the deed of October 1st, 1907; that is, whether Joseph Horwath, who signed as president, was authorized to execute the deed. Another is perhaps whether the mortgage to the Hungarian bank is a valid lien upon the church lands from a legal standpoint. These questions are not of importance to the present suit under the view that I have taken of the main part of the case. If the persons who were elected as trustees on September 8th were actually such trustees, I do not understand how Mr. Horwath could have authority to sign the deed.

The result is that the bill should be dismissed, with costs, and I will so advise.