96 N.J. Super. 556 (1967)
233 A.2d 663
ST. JOHN'S GREEK CATHOLIC HUNGARIAN RUSSIAN ORTHODOX CHURCH OF RAHWAY, NEW JERSEY, ETC., ET AL., PLAINTIFFS-RESPONDENTS,
v.
MICHAEL FEDAK, ET AL., DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued November 21, 1966.
Supplemental briefs filed December 29, 1966.
January 19, 1967.
January 20, 1967.
February 16, 1967.
Decided September 12, 1967.
*560 Before Judges GAULKIN, LEWIS and LABRECQUE.
Mr. Jerome C. Eisenberg argued the cause for appellants (Messrs. Clapp & Eisenberg, attorneys; Mr. Stuart L. Pachman and Mr. Philip Adler (of the New York Bar), on the brief).
Mr. Paul R. Williams, Jr. argued the cause for respondents (Mr. Dominick A. Mirabelli, attorney).
Mr. John O. Bigelow, amicus curiae, argued the cause pro se.
*561 The opinion of the court was delivered by LABRECQUE, J.A.D.
Defendants appeal from a judgment of the Chancery Division which (1) adjudged that St. John's Greek Catholic Hungarian Russian Orthodox Church (St John's) was an integral part of the Russian Orthodox Greek Catholic Church of America (hereafter the Metropolia) and, as such, subject to its laws and discipline; (2) set aside the attempted discharge of Reverend Theophil D. Krehel (Father Krehel) as pastor of the church; (3) held void a resolution by St. John's to affiliate with another Orthodox jurisdiction; (4) ordered a new election of officers and trustees, and (5) restrained defendants from being candidates for any elective office and from acting as trustees and officers of the church. See St. John's Greek Catholic Church v. Fedak, 89 N.J. Super. 65 (Ch. Div. 1965).
Plaintiffs are the church corporation itself, Father Krehel the pastor, a trustee, an auditor, and a group of individual members of the parish. The defendants are the remaining officers and trustees.
The present appeal does not involve claims by rival hierarchies to jurisdiction over the parish of St. John's. In essence, we are confronted with a disagreement among the members of the congregation, plaintiffs contending that St. John's is part of the Metropolia and defendants contending that it is a self-governing autonomous parish which never agreed to be bound by the Metropolia's rules and discipline and hence could by majority vote join another Orthodox jurisdiction.
St. John's was founded in 1915 and incorporated in the following year under the General Religious Society Act of 1875, 3 Comp. Stat., p. 4307 et seq., now R.S. 16:1-1 et seq. It is not disputed that until some time in 1924 it was a constituent church of the Moscow Patriarchate of the Russian Orthodox Church.
The latter was an autocephalous member of the Eastern Orthodox Greek Catholic Church which sprang from the Church of Constantinople. By the 16th Century its autonomy *562 was recognized. It remained a hierarchical church with a patriarch at its head until the time of Peter the Great. Thereafter, until 1917, it was governed by a group of ecclesiastics known as the Holy Synod.
The history of Orthodoxy, with relation to the North American Diocese, has been extensivly treated in a number of judicial opinions. See Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952); St. Nicholas Cathedral of Russian Orthodox Church v. Kedroff, 302 N.Y. 1, 96 N.E.2d 56 (Ct. App. 1950); reversed 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952); Russian Orthodox Greek Catholic Church v. Burdikoff, 117 Ohio App. 1, 189 N.E.2d 451 (Ct. App. 1962); Ryszko v. Kaimakan, 108 N.J. Eq. 34 (Ch. 1931). It first came to North America in the form of missionary activities in Alaska and the Aleutian Islands, spreading slowly southward and then eastward. By 1904 the Orthodox Diocese of North America and the Aleutian Islands was functioning, with Archbishop Tikhon as its first head. His appointment, together with those of his successors Platon and Evdokim, came from the Holy Synod.
With the onset of the Russian Revolution Evdokim went to Russia and never returned. At an All Russian Sobor (convention) held in Moscow in 1917 the control exercised by the Holy Synod was terminated and Archbishop Tikhon was elected Patriarch of Moscow. Following the establishment of Bolshevik control in late 1917 he was first restricted and later imprisoned.
On November 20, 1920 Tikhon, as Patriarch, issued a Decision (Ukase) which granted, subject to "confirmation later to the Central Church Authority when it is re-established," a considerable degree of autonomy to the Orthodox churches outside of Russia in cases where the ruling authority might be unable to function because of the troublesome times. In such cases authority was given to set up a "temporary highest Church Government or a Metropolitan District."
*563 In 1924 a sobor of the American churches was held in Detroit at which 115 of the 300 American Orthodox churches were represented. The sobor resolved (1) to "leave Metropolitan Platon as the head of our church here" (he was functioning as Bishop by appointment of the Holy Synod), and (2) to "recognize" ourselves as a self-governing church. Subsequent resolutions implementing the foregoing made provision for the administration of the American church under what came to be known as the Metropolia or the American Metropolianate. Archbishop Platon was elected as its first Metropolitan or Primate. At the time of most of the events here involved his successor as ruling Metropolitan was Archbishop Leonty. He was succeeded by Archbishop Ireney in September 1965.
In 1945, following the appointment of Archbishop Alexi (Alexy) as Patriarch of Moscow, reunion with the Moscow Patriarchate was the subject of negotiations between representatives of the Patriarch and the Metropolia. See Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church, supra, 73 S.Ct., at p. 143, 97 L.Ed., at pp. 130-131. At the 1946 All American Sobor it was resolved that the Metropolia should carry on as a self-governing church until certain conditions respecting the autonomy of the American church demanded by it were accepted by the Patriarch. At a sobor held in 1955 a formal "Statute" or set of rules and regulations for its government and discipline (hereinafter the Statute) was adopted. There were some amendments to the Statute at subsequent sobors held in 1959 and 1963. Resolution of the present controversy depends, in great part, upon whether the Statute is binding upon St. John's.
In January 1960 Father Krehel, who had been pastor since 1958, presented the Statute to the congregation for approval. The matter was carried over until the June meeting when, after much discussion, the Statute was overwhelmingly rejected. The principal objection was the extent of clerical supervision of parish affairs authorized *564 by article VI of the Statute. In May 1963, pursuant to a suggestion previously made, proposals for amendment were submitted to the Metropolia on behalf of the congregation but were not accepted. The church continued to withhold approval.
In January 1964 Father Krehel sent a list of the newly elected officers of the church to the Metropolia Bishop for confirmation, calling attention to the fact that five of them had not fulfilled the requirement of partaking of the Sacraments of Confession and Holy Communion as required by the Statute. The trial judge found that the five excepted officers were confirmed after they had "reluctantly complied" with the religious qualifications mentioned.
On March 24, 1964 the Chancellor of the Metropolia circulated "Resolution No. 486" among the parishes in New Jersey, disapproving participation in a so-called President's Club, an organization made up of members of various parishes, presumably for the purpose of discussion of their mutual problems. The response at St. John's was a special meeting of the congregation, held on June 7, 1964, at which the church (executive) committee was authorized to continue to conduct the business affairs of the parish and to seek legal counsel. Four days later "all parties involved" were summoned to appear on September 15, 1964 before the Diocesan Ecclesiastical Court of the Metropolia.
At the regular meeting of the congregation held on July 12, 1964 it was determined to join another Orthodox jurisdiction. The church committee was detailed to investigate and report. The committee's report was to be submitted to the congregation on September 20. In the meantime an order to show cause was issued out of the Diocesan Court directing each of the defendants to show cause on September 17, 1964 why he should not be suspended from office. A request by defendants for an adjournment was denied and the court, after an ex parte hearing, entered an order suspending defendants and authorizing Father Krehel to appoint *565 such officers as might be necessary to carry on parish functions and pay necessary salaries and expenses.
At the September 20 meeting of the congregation the committee reported with a recommendation to disassociate from Metropolia and affiliate with the Carpatho-Russian Diocese of Bishop Orestes Charnock (Chorniak). The motion to do so was carried and a second motion to give Father Krehel 30 days' notice of termination of his services as pastor was likewise passed. The present action followed.
Before proceeding to the merits we take cognizance of defendants' contention that it was error to permit St. John's and Father Krehel to remain as parties plaintiffs in the suit. We hold that Father Krehel was properly joined as a party plaintiff. Skinner v. Holmes, 133 N.J. Eq. 593, 596 (Ch. 1943); Whitecar v. Mechenor, 37 N.J. Eq. 6 (Ch. 1883). See also New Jersey Annual Conference of First Episcopal District v. Lattimore, 6 N.J. Super. 348, 352 (App. Div. 1950). As to St. John's, it was a necessary party and had it not been joined in the first instance a motion to join it as a defendant would have been in order. Defendants have suffered no prejudice by reason of its inclusion as a plaintiff.

THE RELATIONSHIP BETWEEN ST. JOHN'S AND THE METROPOLIA
It is conceded that no formal approval of affiliation with the Metropolia was ever voted by the congregation of St. John's. In concluding that it had nevertheless become "an integral part" of the Metropolia the trial judge relied on certain actions on the part of St. John's or its officers. These were its (a) continued relationship with Archbishop Platon after the Detroit Sobor of 1924; (b) dependence upon the Metropolia for most of its priests during the ensuing period; (c) financial donations to the Metropolia over the years; (d) participation by either delegates or observers at certain of the sobors of the Metropolia, and (e) *566 acceptance of the authority of the Metropolitan and consultation with him concerning various parish matters. We hold that they are not sufficient to establish the affiliation necessary to support that conclusion.
The trial judge found, and we agree, that the Metropolia is a hierarchically structured church of the Orthodox communion. See Ryszko v. Kaimakan, 108 N.J. Eq. 34 (Ch. 1931). Its doctrine, discipline and worship are set forth in the Statute as those of the One Holy Catholic and Apostolic Church, as taught by Holy Scripture, Holy Tradition, the Seven Ecumenical Councils, and the Holy Fathers, and as kept by the Orthodox Churches of the East. It is a member of the World Council of Churches, which accepts into its membership only autonomous church bodies. Its superior authority is vested in the All American Sobor, the periodic convention of the clergy and laity of its constituent churches. The sobor passes on all church matters but the bishops must approve all resolutions. It elects the Metropolitan who is the highest ranking official of the church and its spiritual leader. He is assisted administratively by the Metropolitan Council and by the Bishops' Sobor. The Bishops' Sobor is the supreme ecclesiastical authority and supervises church schools, seminaries and colleges. The basic constituent level of the Metropolia is the diocese, which ordinarily is governed by a bishop assisted administratively by a diocesan assembly, a body composed of representatives of the clergy and laity. The assembly elects a diocesan council as a permanent administrative body for the diocese. The diocese is subdivided into deaneries presided over by a dean dealing directly with the parish. The latter is the smallest component of the church and the lowest level of the hierarchy.
As noted, St. John's was incorporated under the General Religious Society, Act of 1875, 3 Comp. Stat., p. 4307 et seq., now R.S. 16:1-1 et seq. During the 90 years since the original act went into effect there has been, almost without any exception here pertinent, a consistent strengthening *567 of the property rights of the local incorporated "religious society or congregation."
By R.S. 16:1-4 a religious society incorporated under the act is vested with power to:
"* * *
d. Appoint such officers, agents and employees as may be required for its properties, institutions and business;
e. Make by-laws and rules consistent with law, for the regulation and management of its affairs, properties and institutions;

* * * * * * * *
i. Have the management, direction and control of all the civil and temporal affairs of the congregation, church or parish * * *."
R.S. 16:1-5 provides that the proceedings, orders and acts of a majority of the members of the corporation present at any duly convened annual or special meeting, but not of a less number, shall be valid and effectual. R.S. 16:1-8 provides for the election of trustees, and N.J.S.A. 16:1-13.1 provides for the election of officers and directs that such officers shall be members of the board of trustees during the terms of their respective offices.
As authorized by law, St. John's appears to have adopted by-laws at an early date in its history but the pages of the minute book where they had been recorded were torn out or mutilated and by-laws were "readopted" in 1932. Among the provisions thereof are the following:
"* * *
4. The Trustees-Officers, with the aid of the priest-pastor, manage the affairs of this Church and its properties. In their management they are responsible to the members of the congregation * * *.

* * * * * * * *
8. The Officers-Trustees and kurators are to be relieved of their office only by decision of a majority at a lawfully called meeting of the congregation.

* * * * * * * *
11. All church-congregational decisions in regards to the acceptance of: the priest-pastors, the teacher, election of church officers, trustees, kurators and other office holders may come about only at a meeting of the congregation, through the majority of valid votes of the members present at such meeting.

*568 * * * * * * * *
15. Any christian, who is an orthodox and fulfills the regulations, laws and demands of this congregation and the Russian Orthodox rite can become a member of this congregation * * *.

* * * * * * * *
27. The priest-pastor shall obey the By-Laws of this congregation. If the priest causes disruption and misunderstanding, or premeditately causes harm to the church or congregation and does not fulfill his pastoral duties, then the members can complain of his actions to the Bishop and ask for his removal.
28. The priest-pastor cannot, of his own will, leave this charge, without giving an advance 30 day notice to the members of the congregation, and the congregation also cannot remove the priest without giving him a 30 day notice in advance.

* * * * * * * *
42. All matters of the congregation shall be discussed and decided in a legal way and manner, in the legal meeting place, with the participation of the church officers, the pastor and the members, at a church meeting of the congregation."
By way of comparison, article VI of the Statute, which purports to regulate parish affairs, provides, in general, that all actions of the congregation including the election of officers shall be subject to the approval of the diocesan authority. In it the diocesan authority is given the sole power to appoint and remove priests, and the priest-rector is granted powers which are in conflict with those vested in the elected trustees and officers by the bylaws.
We are in accord with the conclusion of the trial judge that the absence of any explicit or formal acceptance by St. John's of control of its affairs by the Metropolia is not necessarily determinative of the relationship between them. The nature of such relationship may be inferred from the facts notwithstanding the absence of formal acceptance. American Primitive Society v. Pilling, 24 N.J.L. 653, 657 (Sup. Ct. 1855). See also Russian Orthodox Greek Catholic Church v. Burdikoff, supra. We hold that whatever the relationships were between St. John's and the Metropolia between the time of the 1924 Detroit Sobor and the Sobor of 1946, they did not constitute an adherence by St. John's to the Metropolia as a separate independent unit of the Orthodox Communion. On the contrary, they were equally *569 consistent with recognition of the authority of the Moscow Patriarchate (Exarchate) or of the Russian Church Abroad (the so-called Karlovitz Synod) with which many Russian Orthodox churches outside of Russia, including, at one time, the Metropolia, were associated. St. John's recognition of the authority of Archbishop Platon, to the extent revealed in the record before us, is of little or no significance in resolving the question. As noted, he was reassigned as Bishop of the North American Diocese prior to the 1924 sobor, and St. John's, which was not represented at the 1924 sobor, did no more than continue to recognize him thereafter.
Prior to the 1946 sobor the Metropolia did not profess to have a separate existence as a church distinct from the Russian Orthodox Church which had been headed by Archbishop Tikhon. Its asserted right to exist separately was based upon the decree of 1920 authorizing the organization of "a temporary highest Church Government or a Metropolitan District." As noted above any action taken under that decree was, by its terms, to "be submitted for confirmation later to the Central Church Authority when it is re-established." At the Detroit Sobor of 1924 Archbishop Tikhon's status as ruling Patriarch was left unquestioned and Archbishop Platon, whose assignment to the North American Diocese had been confirmed by Tikhon, was elected Metropolitan. The initial resolution adopted at the sobor declared the self-governing status of the North American Church to be temporary, "until the convocation of the All Russian Sobor * * *." This was confirmed by a second resolution which provided that "the final regulation of questions arising from the relationship of the Russian and the American Churches" should be left "to a future Sobor of the Russian Orthodox Church which will be legally convoked, legally elected, will sit with the participation of the representatives of the American Church under conditions of political freedom, guaranteeing the fullness and authority of its decisions for the entire Church, and will be recognized *570 by the entire Oecumenical Orthodox Church as a true Sobor of the Russian Orthodox Church." Further confirmation of this intention is afforded by another resolution which provided that final agreement as to the fate of the American Church was reserved until the convening of the All Russian Sobor referred to.
As noted, the year 1945 saw the beginning of a series of conferences and negotiations with the avowed purpose of bringing about a reunion between the Metropolia and the Moscow Patriarchate. Details of these negotiations have been referred to in prior decisions and need not be repeated here. See Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church, supra, 344 U.S., at pp. 104-105, 73 S.Ct. 143, 97 L.Ed. 120; St. Nicholas Cathedral of Russian Orthodox Church v. Kedroff, supra, 302 N.Y. 1, 96 N.E.2d, at pp. 64-65. At the All American Sobor held in 1946 a resolution was adopted which provided that:
"WHEREAS, the 7th All American Sobor of the Russian Orthodox Church of North America having assembled in Cleveland, Ohio, on November 26-28, 1946, and having thoroughly considered the relations of our Church in America with the Patriarchal Church of Moscow and all Russia, and affirming our complete faith and loyalty to His Eminence, our elected, Metropolitan Theophilus;
NOW THEREFORE BE IT RESOLVED, that His Beatitude Alexy, Patriarch of Moscow and all Russia be requested to continue us in his fold and be our Spiritual Head, conditioned upon the Church in America retaining its present autonomous status and the right of self government. That the periodic All American Sobors of the Russian Orthodox Church of North America shall remain the Supreme Legislative and Administrative body of our Church; at these Sobors the Church shall continue to elect its own Metropolitan, and make and adopt its own laws by which the Church in North America is, in all respects, governed;
AND WHEREAS the Patriarchal authority is not consistent with the authority of the Synod of the Russian Orthodox Church Abroad, this Sobor does hereby
RESOLVE; That any administrative recognition of the Synod of the Russian Orthodox Church Abroad is hereby terminated, retaining, however, our spiritual and brotherly relations with all parts of the Russian Orthodox Church Abroad;
AND BE IT FURTHER RESOLVED that in the event that the aforesaid conditions are found not to be acceptable to his Beatitude, *571 the Patriarch of Moscow and all Russia, the Russian Orthodox Church of North America shall continue, and does remain, self-governing until such time as the Patriarch of Moscow and all Russia finds it possible to accept the conditions herein stated." (Emphasis added)
By 1947 all efforts at accommodation had failed and the break had become complete.
At most, it would appear clear that, prior to the 1945-1947 efforts at rapprochement, the Metropolia considered itself an integral part of the Patriarchate, temporarily separated by reason of political conditions in Russia and seeking reunion under conditions of political freedom. As such it can hardly be said that adherence to or association with the Metropolia during that period amounted to a repudiation of other canonical branches of Orthodoxy. It was during this period that the 1932 bylaws of the congregation were adopted. In them we find no support for the conclusion of the trial judge that they confirmed plaintiffs' claim of integral affiliation with the Metropolia, on the theory that the reference to "superior authority" therein necessarily meant the Metropolia and that by the office of Dean was meant the Metropolia Deanery. The bylaws provided that the church was under the spiritual authority of the "lawful governing Archbishop of the Russian Orthodox Church in America" (emphasis added). This reference was not necessarily restricted to the Metropolitan of the American Church. Cf. Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church, supra, 344 U.S., at p. 120, 73 S.Ct. 143. Actually, Archbishop Platon, whose appointment to the North American Diocese had come from the Holy Synod and had been confirmed by Patriarch Tikhon, was the ruling Metropolitan in 1932. Further, the office of Dean was not exclusive with the Metropolia but had preexisted it.
Nor does the record of what transpired after 1946 support the conclusion that St. John's had become an integral part of the Metropolia. The trial judge found that the fact that priests were secured from Metropolia from 1927 to *572 the beginning of the present controversy was a "good indication of affiliation." However, an examination of the record before us concerning the employment of priests during that period supports the conclusion that they recognized that their services in the parish depended upon their acceptance by the congregation and their compliance with the bylaws. The 1932 bylaws required that decisions regarding the "acceptance of" priest-pastors were to be made "only" by a majority vote at a meeting of the congregation, and prescribed 30 days' notice as a condition precedent to termination of the pastor's services. It was testified that this represented a reenactment of the prior bylaws, and some confirmation of this is found in the fact that the services of both Father Dutko and Father Propheta, who served between 1924 and 1926, were terminated by resolutions of the congregation upon 30 days' notice. At the time the 1932 bylaws were adopted the pastor was Father Bezsmertnuk, a priest secured through the Metropolia in 1926. His services were terminated on October 29, 1933 by a notice from the congregation which read:
"Notice from the Parish of St. John's Greek Catholic Hungarian Russian Orthodox Church of Rahway, N.J. to Rev. Bezsmertnuk: The undersigned officers of the Church announce to you that the Parish meeting decided to give you 30 days notice, that means you will leave our Parish. Besides this, from the 29th day of October you will not be paid."
He was succeeded by Father Baran, also assigned by the Metropolia, who assumed the pastorate following his acceptance by a vote of the congregation.
Father Baran was succeeded by Father Semanitzsky in 1941 and in 1948 the latter was succeeded by Father Stroyen. Father Stroyen's services were terminated by his resignation on July 26, 1953 upon 30 days' notice to the congregation. His successor, Father Telep, served five years and, upon submitting his resignation on January 26, 1958 he wrote that "I am giving this 30 day notice in accordance with *573 the bylaws of our church." A month later, when the Archbishop sought to assign a Father Kreschik to the parish, the church committee wrote him:
"In accordance with our conversation, please be advised that Father Kreschik's assignment to the St. John's, the Baptist Church of Rahway, New Jersey is not in the best interests of the Parish. The greater majority of our foreign born parishioners speak a Carpatho Russian dialect and we have been informed by Father Kreschik that he speaks High Russian. In view of this, we ask Your Grace to reconsider the assignment.
We understand that Mr. Theophil D. Krehel, a graduate of St. Tikhon's Seminary, is desirous of being ordained a Priest and of being assigned to our Parish. In view of the lack of suitable candidates and the nearness of the approaching retirement of Very Rev. John N. Telep, and with your Grace's permission, we will accept Mr. Krehel as our Parish Priest subject to his properly carrying out his Priestly duties and administering to the needs of the Parish."
The request to appoint Father Krehel was honored and he was assigned to the parish.
We find the intermittent participation of delegates from St. John's at the sobors mentioned by the trial judge to be of no substantial significance in the determination of the issue of whether St. John's lost its autonomy. Sobors were generally held every four years. The principal item of business before the 1946 sobor was the effort at reunion with the Patriarchate which, as noted, eventually failed. The record is devoid of proof that it was ever made clear to the congregation that the price of attendance at a sobor was complete submission to whatever rules concerning parish administration the sobor might enact. In the instances referred to it was invited to send representatives to the All American Sobor without the imposition of any conditions.
Nor do the miscellaneous and intermittent financial payments found by the trial judge to have been made to the Metropolia support the conclusion that St. John's thereby became an integral part of it. Such payments were not made in a manner which was violative of the bylaws. Most of them may be considered as contributions. If some be *574 considered as "required" assessments, they were never paid as "required" prior to Father Krehel's pastorate. The lack of any substantial effort at enforcement of such payments supports the conclusion that, as to St. John's, they were voluntary payments made in recognition of the assistance of the Metropolia in securing priests and rendering other spiritual services. The visit to the church by the ruling archbishop, the request for his blessing on the proposed construction of a new church edifice, visits to his home on Long Island, and similar occurrences amounted to no more than a recognition and honoring of his spiritual authority. The attempts at accommodation which took place after rejection of the Statute by the congregation did not constitute an acceptance of the authority of the Metropolia or an abandonment of the autonomy of the parish.
The Statute is said to have been prepared and adopted after much study and consideration by those having great experience and qualifications in the field. Regardless of its merits, we are satisfied that, in the absence of consent by the congregation, it was not effective to deprive St. John's of its ancient right, protected by the New Jersey statute under which it was incorporated, to conduct its temporal affairs through its duly elected officers under bylaws adopted by it. In St. John the Baptist Greek Catholic Church v. Gengor, 121 N.J. Eq. 349, 354-356 (E. & A. 1937), it was held that this right could not be taken away by reincorporation of the church under a statute which authorized such action upon the approval of a majority of the trustees, without providing for congregational approval. If the Legislature was not free to authorize such action in Gengor, we are satisfied that it may not be accomplished by private legislation (the Statute) in the absence of consent by the congregation. The failure to require compliance with the Statute prior to 1960 and the efforts thereafter to secure its approval by the congregation imply recognition of the fact that such consent was never given. Father Krehel was a member of the Bar as *575 well as an ordained priest and he undoubtedly was impelled to attempt to secure adoption of the Statute because of the difficulties involved in seeking to carry on his duties under regulations prescribed by his superiors while at the same time complying with the bylaws of the congregation which had retained him.
Here there was much more than a mere absence of formal acceptance of control by the Metropolia. On the proofs before us the continued, consistent insistence by the congregation upon its right to conduct its own temporal affairs and to be served by priests acceptable to it who would conduct themselves in accordance with its bylaws, stands in the way of any finding that these rights were ever voluntarily abdicated. This is especially so when, as here, the old form of parish administration continued without substantial change from the time of the enactment of the Statute until the onset of the present controversy. Cf. St. John the Baptist Greek Catholic Church v. Gengor, supra, at p. 355. We therefore hold that the by-laws continued to control the management of St. John's temporal affairs.
By the terms of the judgment appealed from defendants were restrained from (1) transferring church property to any other ecclesiastical jurisdiction, (2) interfering with Father Krehel in the performance of his priestly duties, and (3) being candidates for any elective office in the parish. The resolution to affiliate with another Orthodox jurisdiction was held to be void and of no effect and the attempted termination of Father Krehel's services upon 30 days' notice was invalidated. Finally, the counterclaim, which sought to restrain Father Krehel from continuing to serve as pastor, was dismissed. We proceed to consideration of these terms.

STATUS OF THE DEFENDANTS AS OFFICERS OR TRUSTEES
At the time of the filing of the complaint herein defendants constituted all of the officers and trustees of *576 the congregation, with the exception of the two who joined in the complaint. Under the bylaws it devolved upon the officers and trustees to manage the affairs of the church and its properties, being responsible to the members of the congregation for their actions. It is not contended that defendants were not duly qualified for office under the bylaws at the time of their election. We hold that it was error thereafter to enjoin them from performance of their duties or from again being candidates for elective office in the parish. While the validity of their excommunication by the Metropolia is one involving its church discipline, concerning which we make no determination, such excommunication could not affect their status as members of St. John's nor preclude their continuance as officers or trustees thereof. Implicit in the bylaws was the requirement that upon their election and qualification they be possessed of the requisites of membership. The retention of good spiritual standing in the Metropolia was not a requisite to the holding of office. The Metropolia was without power to deprive a member of the congregation of his membership and right to office. The question of the removal from office of a trustee or officer was one reserved to the congregation by the bylaws.

THE CONGREGATIONAL RESOLUTIONS OF JULY 12, 1964 AND SEPTEMBER 20, 1964
Since St. John's was not an integral part of the Metropolia it was free to affiliate with another Orthodox jurisdiction. We turn to consideration of plaintiffs' challenge to the resolution voting affiliation with Bishop Charnock's diocese. As noted above, the resolution adopted at the July 12, 1964 semi-annual meeting of the congregation provided only generally for affiliation with another Orthodox jurisdiction. After a study by the church committee, a special meeting was held on September 20 at which members of the congregation voted to join Bishop Charnock's Carpatho-Russian *577 Diocese. The meeting had been duly advertised in the church bulletin as a special one for the purpose of voting on the report and recommendation of the committee. Prior thereto, members of the church committee had met separately with representatives of the Metropolia and of the Exarchate, and with Bishop Charnock.
Since the trial judge found that St. John's position as an integral part of the Metropolia precluded it from affiliating with another jurisdiction, he had no occasion to pass upon any additional objections to such action. The question presents itself whether the matter should be remanded for further findings thereon or whether we should take advantage of the authorization afforded by the rules, R.R. 1:5-4(a) and (b); R.R. 2:5, and arrive at our own findings. See Abeles v. Adams Engineering Co., Inc., 35 N.J. 411, 423-424 (1961). We incline to the latter course because of the nature of the question involved and the additional time which would be entailed by a remand and a second appeal.
The limited role available to the courts in church disputes has been reiterated time and again. In general, decisions of the highest authorities of the church organization on questions of discipline, faith and ecclesiastical rules, custom and bylaws are binding on the courts. Watson v. Jones, 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1872). In the case of property belonging to a particular ecclesiastical organization which is part of a larger general church organization, a majority cannot secede from that organization and transfer the property of the church to another use. American Primitive Society v. Pilling, supra, 24 N.J.L., at pp. 657-658; True Reformed Dutch Church v. Iserman, 64 N.J.L. 506 (Sup. Ct. 1900); Presbytery of Jersey City v. First Presbyterian Church, 80 N.J.L. 572 (Sup. Ct. 1910); Karoly v. Hungarian Reformed Church, 83 N.J. Eq. 514 (Ch. 1914), affirmed 84 N.J. Eq. 203 (E. & A. 1915); Kelly v. McIntire, 123 N.J. Eq. 351 (Ch. 1938). In the latter case the court held that:
*578 "The principle seems to be firmly established that a congregation belonging to a religious denomination and subject to the constitution, faith and doctrine thereof, cannot use its property for a purpose other than that sanctioned by the denomination." (at p. 361)
Compare, however, Pules v. Iserman, 71 N.J.L. 408 (Sup. Ct. 1904); Vargo v. Vajo, 76 N.J. Eq. 161 (Ch. 1909).
We incline to the view that adoption of the resolution in question did not amount to a deviation from the purposes and uses to which the church, through its congregation, was dedicated, and we hold that the action taken was valid and effective.
Initially, we note that the original founders of St. John's, although of Orthodox persuasion, were not necessarily of Russian origin. They were more accurately referred to as Carpatho-Russians, i.e., coming from the area which takes its name from the Carpathian Mountains which separated Russia from Austria-Hungary. Those in that area recognizing the Pope of Rome as spiritual head were generally known as Uniates or Greek Catholics and retained the practices and rites commonly known as Byzantine. In the absence of a national Orthodox church those not accepting the Pope's jurisdiction came within the jurisdiction of the Russian Orthodox Church. When the founders of St. John's came to the United States they found a Russian Orthodox diocese already in existence and continued to affiliate with it up to the time of the 1924 Detroit Sobor. Yet, notwithstanding this affiliation, the people of St. John's continued to be mindful of their Carpatho-Russian origin. In 1925 they obtained a pastor through Archbishop Adam, then head of a Carpatho-Russian diocese. Section 2 of their by-laws provided that the church belonged to the Uhro (Carpatho)-Russian people and would always remain in their possession. They rejected a priest sent by the Archbishop who spoke High Russian rather than the Carpatho-Russian dialect with which they were familiar.
We hold St. John's to be a congregation incorporated under the laws of this State for the purpose of affording to *579 its members a means of worship according to the Eastern rite of the Orthodox Church. We find it significant that the bylaws, although enacted during the term of Metropolitan Platon and while St. John's was being served by a Metropolia priest, specified only that the church adhered "to the teachings, canons, discipline and regulations of the Russian Orthodox Greek-Catholic Church of the Eastern Rite" and required only that a member thereof be "an orthodox" who "fulfills the regulations, laws and demands of this congregation and the Russian Orthodox Rite."
Orthodoxy is a term generally adopted to distinguish the doctrine, discipline and worship of the Eastern, as distinguished from the Western (Roman) Church. In general, the various branches of the Orthodox Church are independent from one another in the sense that they have no centralized authority. The Patriarch of Constantinople presides over that portion of Orthodoxy which has its headquarters in Istanbul, Turkey, and is recognized as first among equals among the Patriarchs. While there may be some differences in liturgical services and dress, in essence all Orthodox churches adhere to the same customs and traditions in the performance of the Divine Liturgy and similar services.
We hold that affiliation with the diocese of Bishop Charnock did not represent a departure from the uses and practices to which St. John's was originally devoted. Bishop Charnock's diocese was known as the Carpatho-Russian Diocese or the American Carpatho-Russian Orthodox Church. The core of the diocese was a group of parishes which in the mid-30's were received into the Greek Orthodox Church by the Ecumenical Patriarch. The diocese continues under the latter's jurisdiction. From the standpoint of the consistent efforts of the members of St. John's to stress the ethnic origin of its founders, affiliation with a Carpatho-Russian diocese would appear to be a closer approach to, rather than a departure from, the purposes for which it was established.
*580 We perceive no merit to the contention, based upon the testimony of Father Schmemann, plaintiffs' expert witness, that the rites and practices of the Carpatho-Russian Church vary significantly from other Orthodox rites. The canonical status of the Ecumenical Patriarch as head of the Patriarchate of Constantinople is not questioned. Father Schmemann's own ordination took place at the hands of an Orthodox Archbishop who was also under the jurisdiction of the Ecumenical Patriarch. Such differences as were noted by the witness were of no signficance. Aside from this, the matter of any alleged deviation from the liturgy or traditions of Orthodoxy within his patriarchate is one to be dealt with by the Ecumenical Patriarch and not by us.

FATHER KREHEL'S STATUS
Since the nature of the relationship between Father Krehel and St. John's was controlled by the parish bylaws, we proceed to consideration of his status under them. The trial judge was of the opinion that paragraphs 27 and 28 of the bylaws, cited above, were controlling and that they were not at variance with the asserted exclusive right of the bishop of the diocese to terminate the assignment of priests. He concluded that paragraph 27 provided the only procedure for termination of a priest's services and that the 30-day notice required of the parish by paragraph 28 was only intended to apply if the bishop determined to accede to a request for the priest's removal. Defendants urge that this conclusion is erroneous, and we agree.
In determining the issue involved, all of the bylaws bearing on the subject are to be considered. 8 Fletcher, Corporations, § 4195, at p. 738 (1966); 18 Am. Jur.2d, Corporations, § 168, at p. 699 (1965). We may also consider the interpretation accorded the bylaws by the parties themselves. See 8 Fletcher, Corporations, § 4195, at pp. 738-739 (1966). The bylaws in question were drawn up by laymen. As noted, they were a reenactment of older by-laws *581 which had become lost or mutilated. They evidence a clear intention that the employment of pastors was to be handled on the congregational level. Before taking office pastors were required to be "accepted" by the congregation. Once accepted, either party could terminate the relationship upon 30 days' notice. The right of termination accorded the congregation by paragraph 28 of the by-laws was not dependent upon prior action by the bishop pursuant to paragraph 27. Paragraph 27 refers to complaints by members of the parish seeking removal of the pastor, as distinguished from formal termination of the pastoral relationship by the congregation. As noted, the congregation consistently claimed this right of termination. The assignment of Father Baran to the parish in 1933 after the services of Father Bezsmertnuk had been involuntarily terminated by the congregation, affords evidence that this practice was acquiesced in by the Metropolia. In holding that the congregation was free to terminate a pastor's services we do not imply that the bishop thereby became obligated to furnish a replacement.
While the congregation was free to terminate the services of Father Krehel upon the giving of the required notice, we are in accord with his contention that the procedure followed in doing so fell short of that required for congregational action under the bylaws. The bylaws provided for two regular meetings annually. They also provided:
"14. The annual meeting of the congregation is announced from the pulpit in church three times in succession, when the time and reason is given to the members."
The meeting of September 20, 1964 was a special meeting. Its purpose, as set forth in the notice of the meeting, was to consider and vote upon the report of the committee which had been investigating affiliation with another Orthodox jurisdiction. The congregation was therefore without the requisite formal notice that termination of the pastor's services was to be an item of business. 5 Fletcher, Corporations, *582 § 2009, at pp. 58-59 (1952). The number attending the meeting was some 78, whereas it would appear that more than 250 were eligible to vote under the bylaws. In the absence of adequate notice of the purpose of the meeting the resolution was invalid.
We make no finding as to the validity of the excommunication of the defendant officers and trustees by the authorities of Metropolia. Since defendants do not recognize any authority by the Metropolia over them, we perceive no need to determine that controversy even had we jurisdiction to do so  which we do not. In a hierarchical church the determination of those who are in good spiritual standing is one for the hierarchy rather than the courts.
Accordingly, that portion of the judgment dismissing the counterclaim and setting aside the resolution terminating the services of Father Krehel is affirmed. In all other respects the judgment of the Chancery Division is reversed.
Remanded for further proceedings in accordance with this opinion.
No costs.