THE PROTESTANT EPISCOPAL CHURCH IN THE DIOCESE OF NEW JERSEY, THE TRUSTEES OF CHURCH PROPERTY OF THE DIOCESE OF NEW JERSEY, AND THE RIGHT REVEREND ALBERT W. VAN DUZER, PLAINTIFFS-RESPONDENTS, v. THE REVEREND STANWOOD E. GRAVES, GEORGE ROUSSEAU, ALPHEUS OAKES, JOANNA CHILD, GORDON GRISWOLD, HOWARD OAKLEY AND WALTER K. SMITH, DEFENDANTS, AND DONALD S. MOORE, CAROLYN B. LORINCZ, WILLIAM E. VACTOR, SR., MICHAEL BROWN, JOHN HOOK, CHARLES CURTIS, ARNOLD GARDNER, AND THE RECTOR, WARDENS AND VESTRYMEN OF SAINT STEPHEN'S PARISH OF PLAINFIELD, NEW JERSEY, DEFENDANTS-APPELLANTS.

Argued April 21, 1980—Decided July 24, 1980.

*Daniel J. Matyola* and *William B. Ball*, a member of the Pennsylvania bar, argued the cause for appellants (*Wharton, Stewart & Davis*, attorneys; *Daniel J. Matyola* and *William B. Ball* and *Philip J. Murren*, members of the Pennsylvania bar, on the brief).

*John Wood Goldsack* argued the cause for respondents (*King, King & Goldsack*, attorneys).

The opinion of the Court was delivered by

SULLIVAN, J.

This case involves a dispute over control of local church property. The denomination involved is the Protestant Episcopal Church. Plaintiffs are the Protestant Episcopal Church (Church) in the Diocese of New Jersey (Diocese), the Trustees of Church Property of the Diocese and the Diocesan Bishop. Defendants are St. Stephen's Parish of Plainfield, New Jersey, and its rector, wardens and vestrymen.

The essential facts are not in dispute. St. Stephen's was incorporated on January 11, 1895 as an affiliate member of the Protestant Episcopal Church.[1] Its corporate title was and still is "The Rector, Wardens and Vestrymen of St. Stephen's Church in Plainfield." For a number of years after its incorporation St. Stephen's did not own any church property. However, in 1935 it purchased the chapel which it had been using for services and the property on which the chapel was situated. In 1967 and in 1970 additional property was purchased for use as a parish hall and school building. In each case the purchase was made with local funds without Diocesan financial assistance. The deeds run to the parish corporation and do not contain any words of trust or reverter in favor of the Diocese.

Defendants concede that from 1895 until 1976, when the local parish became embroiled in a doctrinal dispute with the Diocese of New Jersey and The Protestant Episcopal Church, St. Stephen's operated as an affiliated member of the Diocese and the Church, adhering to long-established Protestant Episcopal customs and usages including submission to Diocesan authority. The parish used the standard prayer book of the Episcopal Church and in 1928 accepted the new Book of Common Prayer. Substantial changes in the canons of the Church were also followed. Annual Diocesan assessments and missionary quotas were regularly paid and delegates regularly sent to the Diocesan Convention. When the parish decided to sell its old rectory and place a mortgage on the new one in 1973 it sought and obtained Diocesan approval in compliance with the requirements of *N.J. S.A.* 16:12–4, part of a 1901 supplement to the 1829 statute

---

[1] The parties and the trial judge assumed that the incorporation was had under the general statute governing the incorporation of religious societies and congregations now *N.J.S.A.* 16:1–1 *et seq.* However, the language of the certificate of incorporation and the procedure used indicate that the incorporation was had under "An Act to incorporate religious societies, worshipping according to the customs and usages of the Protestant Episcopal Church," Laws of New Jersey, Act of February 17, 1829, as supplemented. See "An Act to incorporate trustees of religious societies," §§ 27–38, approved April 9, 1875; and as supplemented by *L.* 1877, *c.* 56 and *L.* 1901, *c.* 62 (now *N.J.S.A.* 16:12–1 *et seq.*)

regulating the affairs of the Protestant Episcopal Church in this State. In short, the undisputed facts demonstrate that from the time of its incorporation, St. Stephen's was an integral part of the hierarchical structure of the Church and submitted to the Church's authority in all matters connected with parish affairs.

The present controversy between the Diocese and St. Stephen's involves doctrinal disputes concerning, *inter alia*, the ordination of women, and changes in the 1928 Book of Common Prayer. In September 1976 the vestrymen of St. Stephen's wrote to Bishop Van Duzer claiming the actions were "heretical" and stating that the parish had decided to suspend its affiliation with the Diocese and the Church, withhold payment of assessments and not participate in Diocesan affairs or accept Diocesan authority.

In April 1977, at a special meeting attended by about 29% of St. Stephen's adult parishioners, a majority of those present voted to sever the parish relationship with the Diocese. As a result, Bishop Van Duzer "inhibited"[2] Rev. Mr. Graves, the rector of St. Stephen's, from performing any priestly duties. Despite the ban, Rev. Mr. Graves continued to conduct services and a substitute priest sent by the Diocese to St. Stephen's was denied permission to officiate at parish services. The present suit followed seeking essentially to bar Rev. Graves from conducting services at St. Stephen's and to restrain defendants from putting parish property to any use not sanctioned by the Diocese.

After the commencement of suit, Rev. Mr. Graves responded to the certificate of inhibition by characterizing the facts alleged as grounds for inhibition as "false." Bishop Van Duzer, however, considered the response to be insufficient, and when Rev. Mr. Graves failed to submit a further response, he was "de-

---

[2]Under canon law of the Protestant Episcopal Church, an inhibited minister is given six months to retract, or to declare the falsity of the facts asserted in the certificate of inhibition. If such retraction or declaration is not made, it is the duty of the Bishop to depose the minister. See Title IV, Canon 10 of The Canons of the Episcopal Church.

posed" by formal action of Bishop Van Duzer. The relief sought was then expanded to include removal of Rev. Mr. Graves from the church rectory.

Cross-motions for summary judgment were submitted accompanied by numerous affidavits and documents. The trial judge granted plaintiffs' motion and entered a declaratory judgment that the parish property could not be used for any purpose not sanctioned by the Diocese. All assets of St. Stephen's were placed under the control of the Trustees of Church Property of the Diocese of New Jersey until the proper Church authorities decided otherwise. The judgment also ordered that Rev. Mr. Graves be removed from the church or parish house except to attend worship services or social events approved by the Diocese.[3] 161 *N.J.Super.* 230 (Ch.Div.1978). On appeal, the Appellate Division upheld the judgment for the reasons expressed by the trial judge. 167 *N.J.Super.* 563 (1979). Defendants-appellants filed an appeal with this Court as of right alleging the existence of a substantial constitutional issue. See *R.* 2:2–1(a). We affirm for the following reasons.

In this country, courts have been repeatedly admonished not to attempt to decide ecclesiastical doctrinal controversies. It has been often stated that "[t]he law knows no heresy, and is committed to the support of no dogma, the establishment of no sect." *Watson v. Jones,* 13 *Wall.* 679, 728, 20 *L.Ed.* 666, 676 (1872). However, subject to certain limitations, a civil court can be called upon to resolve a church property dispute.

The United States Supreme Court has held that the First Amendment does not dictate that a state must follow a particular method of resolving church property disputes and any one of various approaches may be adopted so long as it does not involve consideration of doctrinal matters. *Jones v. Wolf,* 443 *U.S.* 595,

---

[3]Rev. Mr. Graves is no longer involved in this matter, having left St. Stephen's and the Protestant Episcopal Church and become a priest and pastor in another religious denomination in New York. His affidavit filed in the cause states that he no longer represents any interest in conflict with the interests which the plaintiffs seek to protect.

99 *S.Ct.* 3020, 61 *L.Ed.*2d 775 (1979). One acceptable method of approach was outlined in *Watson v. Jones, supra,* which repudiated the English rule that church property was the subject of an implied trust in favor of those who truly adhered to church doctrine. The Supreme Court held that our basic constitutional requirement of the separation of Church and State prevented courts from using the departure from doctrine approach in the adjudication of church property disputes. In the absence of specific trust provisions in the deed, will or other instrument by which the property is held, *Watson* made inquiry as to where the particular church body had placed ultimate authority over the use of church property. Two broad types of church government were recognized. In a congregational church, church authority and control over church property rested completely in the local congregation and its elected elders. In a hierarchical church, however, the local church is an integral and subordinate part of the general church and subject to its authority. *Watson,* therefore, held that in a hierarchical situation where there was a property dispute between a subordinate local parish and the general church, civil courts must accept the authoritative ruling of the higher authority within the hierarchy.

The *Watson* rule, although admittedly not exclusive, has been modified to the extent that a civil court may inquire into fraud, collusion or arbitrariness in the ecclesiastical disposition. *Gonzales v. Archbishop,* 280 *U.S.* 1, 50 *S.Ct.* 5, 74 *L.Ed.* 131 (1929).

The *Watson* principle was followed in *Serbian Orthodox Diocese v. Milivojevich,* 426 *U.S.* 696, 96 *S.Ct.* 2372, 49 *L.Ed.*2d 151 (1976). There, in a hierarchical church dispute over the removal of a bishop with its incidental effect on the adjudication of property rights, the United States Supreme Court reversed a state court ruling that had rejected the decisions of the highest ecclesiastical tribunals of the hierarchical church upon the issues in dispute. In so doing, the Supreme Court ruled that the First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government and to create tribunals for adjudicating disputes over these matters.

The Supreme Court held that when this choice has been exercised and ecclesiastical tribunals have been created to decide disputes over governmental direction of subordinate bodies, the Constitution requires that civil courts accept their decisions as binding upon them. 426 *U.S.* at 724–725, 96 *S.Ct.* at 2387. The Court also declared in *Serbian* that where the resolution of a church property dispute may be a consequence of an ecclesiastical determination, "[c]ivil courts must accept that consequence as the incidental effect of an ecclesiastical determination that is not subject to judicial abrogation, having been reached by the final church judicatory in which authority to make the decision resides." 426 *U.S.* at 720, 96 *S.Ct.* at 2385. Thus, *Watson's* holding with respect to the appropriate role of civil courts remains unchanged even where a church property dispute is incidentally resolved by an ecclesiastical determination.

Another acceptable method of resolving church property disputes is the neutral principles of law approach enunciated by the United States Supreme Court in *Presbyterian Church v. Hull Church*, 393 *U.S.* 440, 89 *S.Ct.* 601, 21 *L.Ed.2d* 658 (1969). This approach, as evolved in succeeding cases, calls for the completely secular examination of deeds to the church property, state statutes and existing local and general church constitutions, by-laws, canons, Books of Discipline and the like to determine whether any basis for a trust in favor of the general church exists. In *Jones v. Wolf, supra,* the most recent decision in this area, the Supreme Court reaffirmed its approval of the neutral principles of law doctrine as one of the various approaches for settling church property disputes. The *Jones* decision involved a church property dispute between the local church and the general church in which the Georgia courts had examined the property deeds, state statutes, local church charter, the general church constitution and Book of Church Order. When the examination failed to reveal any language of trust in favor of the general church, the Georgia courts ruled that more than a mere connectional relationship between the local and general church must be shown to give rise to property rights in the general church. Accordingly, it was held that legal title to the church property

was vested in the local church congregation. The United States Supreme Court approved this neutral principles of law approach as an acceptable method of resolving the particular dispute.

Prior to the United States Supreme Court decision in *Watson*, the New Jersey cases had also recognized the distinction between congregationally structured churches and hierarchical churches. With respect to hierarchical church organization, it has been held that local church bodies were subject to the established discipline and authority of the central church body. *American Primative Society of Paterson v. Pilling*, 24 *N.J.L.* 653 (Sup.Ct.1855); *Den v. Bolton*, 12 *N.J.L.* 206 (Sup.Ct.1831).

After the *Watson* decision, a church property dispute was presented in *Kelly v. McIntire*, 123 *N.J.Eq.* 351 (Ch.1938). In *Kelly*, the Presbyterian Church in the United States of America and one of its local member parishes became involved in a doctrinal dispute. The local parish had declared its severance from the parent church and repudiated the authority of the parent church. In a suit brought by members of the local church "loyal" to the parent church, the court held that "a congregation belonging to a religious denomination and subject to the constitution, faith and doctrines thereof, cannot use its property for a purpose other than that sanctioned by the denomination." *Id.* at 361. The court rested its ruling on statutory provisions of this State relating to the acquisition, holding and use of local church property. *Rev.*1877, *p.* 959, as amended by *P.L.* 1898, *p.* 397, 3 *Comp.Stat., p.* 4309; *P.L.* 1881, *p.* 256, 3 *Comp.Stat., p.* 4312, § 12d. Reference was also made to the statute regulating the incorporation of local Presbyterian parishes. *P.L.* 1905, *p.* 254, 3 *Comp.Stat., p.* 4343, § 81. In addition, the court quoted extensively from *Watson* and appears to have also relied on that holding in determining the property dispute.

More recently, in *St. John's Greek Catholic Church v. Fedak*, 96 *N.J.Super.* 556 (App.Div.1967), certif. den. 50 *N.J.* 406 (1967), a church property dispute involved a hierarchically structured national church (Metropolia) and a local parish which had never formally affiliated with the Metropolia but had participated on a voluntary basis. It was held that the evidence of relationship

was insufficient to establish sufficient affiliation to make the local parish an integral part of the Metropolia. *St. John's*, however, stated that "[i]n the case of property belonging to a particular ecclesiastical organization which is part of a larger general church organization, a majority cannot secede from that organization and transfer the property of the church to another use." 96 *N.J.Super.* at 577.

Against this decisional background we consider the present matter. The Protestant Episcopal Church in the United States of America is a hierarchically structured organization which by virtue of its constitution and canons exercises pervasive control over its constituent parishes and missions. It is undisputed that St. Stephen's was a member church of the Protestant Episcopal Church and remained affiliated with the national church and subject to hierarchical discipline and authority until the present dispute.

In the absence of express trust provisions, we conclude that the hierarchical (*Watson*) approach should be utilized in church property disputes in this State. Only where no hierarchical control is involved, should the neutral principles of law principle be called into play. Here it has been established that the Protestant Episcopal Church is a completely integrated hierarchical body, the ecclesiastical determination of which incidentally resolves the question of control over local church property. This is dispositive of the case.

St. Stephen's Church was incorporated as an affiliated member of the Protestant Episcopal Church. This incorporation has never been changed and the local church organization and its property are subject to the hierarchical authority of the parent church as indicated in the constitutions and canon law of the national church and its dioceses. Under the *Watson* rule, therefore, plaintiffs were entitled to the relief sought.

However, even using the neutral principles of law approach, we reach the same result. St. Stephen's, as heretofore noted, came into existence under the 1829 statute relating to incorporation of religious societies "worshipping according to the customs

and usages of the Protestant Episcopal Church," as supplemented. The latest supplement, *L.* 1901, *c.* 62, now *N.J.S.A.* 16:12–1 *et seq.*,[4] specifically provides in section 4, that the sale, conveyance or mortgage of real estate belonging to an incorporated parish of the Protestant Episcopal Church is subject to the consent of the bishop of the diocese. St. Stephen's recognized the authority of this statutory provision since it is not disputed that when the parish decided to sell its old rectory and place a mortgage on the new one in 1973, it sought and obtained Diocesan approval. The constitution and canons of the national church in Title 1, Canon 6, Sec. 3 require the same consent. Under canon law of the Protestant Episcopal Church, the Rector, Wardens and Vestrymen of a local parish must be members of The Protestant Episcopal Church.

In addition, section 4 of Canon 6 of the national church, adopted after this litigation commenced, now specifies that all parish property is held in trust for the national church and the diocese in which the parish is located. It is true that this express trust provision was not a part of the written canons when St. Stephen's decided to sever its relationship with the Diocese and the national church. Nevertheless, it reflects established customs, practices and usages of The Protestant Episcopal Church.

The basic dispute herein is unquestionably, doctrinal in nature, the ecclesiastical determination of which incidentally affects the control over local church property. *Serbian, supra.* The critical fact is that title to the property remains in the Rector, Wardens and Vestrymen of St. Stephen's Church in Plainfield. St. Stephen's was and still is incorporated as an affiliated member of The Protestant Episcopal Church. The Rev. Mr. Graves has been ecclesiastically deposed as Rector of St. Stephen's. The other individual defendants have disaffiliated themselves from The Protestant Episcopal Church and thereby automatically

---

[4]This statute is appended to the official copy of the Constitution and Canons of The Protestant Episcopal Diocese of New Jersey and is referred to as "governing the same."

terminated their eligibility to hold office as Wardens and Vestrymen of St. Stephen's. They lack standing to dispute the hierarchical assertion of control over St. Stephen's church property. In this connection the (Venerable Canon) Russell Abbott Smith, an expert in the Canon Law of the Protestant Episcopal Church, in his affidavit filed in the cause, after summarizing the happenings at St. Stephen's Church, said:

> Under the circumstances prevailing at Saint Stephen's at the present time, it is impossible for the orderly management of parish affairs to be conducted. Those persons who claim to be Wardens or Vestrypersons openly and avowedly have disclaimed their allegiance to the Episcopal Church and now embrace the faith of a new Church. Under all canonical practices and traditions, these people are not entitled to vote nor to hold office in an Episcopal parish.

The individual defendants are free to disassociate themselves from St. Stephen's and The Protestant Episcopal Church and to affiliate themselves with another religious denomination. No court can interfere with or control such an exercise of conscience. The problem lies in defendants' efforts to take the church property with them. This they may not do. In this regard *Watson* stated the following:

> [T]he appellants in the case presented to us have separated themselves wholly from the church organization to which they belonged when this controversy commenced. They now deny its authority, denounce its action and refuse to abide by its judgments. They have first erected themselves into a new organization, and have since joined themselves to another totally different, if not hostile, to the one to which they belonged when the difficulty first began. Under any of the decisions which we have examined, *the appellants, in their present position, have no right to the property, or to the use of it, which is the subject of this suit.* (emphasis added). [20 *L.Ed.* at 678]

For the reasons stated, we conclude that the ruling in favor of plaintiffs was correct in all respects and is hereby affirmed.

SCHREIBER, J., dissenting.

At the heart of this case is a dispute between a central church and members of a parish over the ownership and control of parish property. The legal question is what is the proper methodology to be applied to resolve that dispute. We are not being called upon to solve a controversy between rival factions

of the same congregation or a religious dispute between members of a parish and a central church.

The First Amendment to the federal Constitution prohibits Congress from making any "law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." This Amendment has been incorporated into the Fourteenth Amendment, so that the states may not establish a religion or prohibit its free exercise. See *Cantwell v. Connecticut*, 310 *U.S.* 296, 303, 60 *S.Ct.* 900, 903, 84 *L.Ed.* 1213, 1218 (1940). The "establishment" and "free exercise" clauses complement each other. See *Abington School Dist. v. Schempp*, 374 *U.S.* 203, 222, 83 *S.Ct.* 1560, 1571, 10 *L.Ed.*2d 844, 858 (1963). Thus, courts may not support the tenets of any one religion and must respect the right of every person to choose his own course with reference to religious observance. To comply fully with these propositions courts should apply neutral principles in deciding controversies arising out of church disputes.

The Supreme Court has pronounced certain basic guidelines which states *must* follow in answering church property questions. They were summarized most recently in *Jones v. Wolf*, 443 *U.S.* 595, 99 *S.Ct.* 3020, 61 *L.Ed.*2d 775 (1979). The first is that civil courts may not resolve church property disputes on the basis of religious doctrine and practice. *Id.* at 602, 99 *S.Ct.* at 3025, 61 *L.Ed.*2d at 784. Accordingly, the Court has rejected the "English approach" of resolving property disputes in hierarchical churches. Under that approach, local church property was impliedly held in trust for the general church so long as the general church adhered to the tenets of faith and practice existing at the time of affiliation by the local church. See *Presbyterian Church v. Hull Church*, 393 *U.S.* 440, 443 n.2, 89 *S.Ct.* 601, 603 n.2, 21 *L.Ed.*2d 658, 662 (1969). If the general church departed from those tenets of faith and practice, the trust failed and ownership vested solely in the local unit. Civil courts would necessarily be called upon to decide what the religious tenets were and whether a meaningful change had occurred. This decision-making would enmesh the courts in questions of religious dogma, a prohibited area. *Serbian E.*

*Orthodox Diocese v. Milivojevich,* 426 *U.S.* 696, 710, 96 *S.Ct.* 2372, 2381, 49 *L.Ed.2d* 151, 163 (1976). Thus, it is impermissible for civil courts to resolve property disputes in this fashion. It follows that, when seeking to decide a particular religious matter involving a hierarchical church, courts must defer to the decision of the church's supreme authority on that matter. *Serbian E. Orthodox Diocese,* 426 *U.S.* at 724–725, 96 *S.Ct.* at 2387, 49 *L.Ed.2d* at 171.

The second basic constitutional guideline is that states are free to adopt any approach to adjudicate church property disputes " 'so long as it involves *no* consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith.' " *Jones v. Wolf,* 443 *U.S.* at 602, 99 *S.Ct.* at 3025, 61 *L.Ed.2d* at 784 (quoting *Md. & Va. Eldership v. Sharpsburg Church, Inc.,* 396 *U.S.* 367, 368, 90 *S.Ct.* 499, 500, 24 *L.Ed.2d* 582, 584 (1970) (Brennan, J., concurring) (emphasis added)). The Supreme Court has approved one method, the application of "neutral principles of law." *Jones v. Wolf,* 443 *U.S.* at 602, 99 *S.Ct.* at 3025, 61 *L.Ed.2d* at 784. This method relies on objective, traditional concepts of trust and property law familiar to lawyers and judges. The analysis used is that generally followed in private law. As applied in *Md. & Va. Eldership,* the neutral principles approach resolved a local church property dispute on the basis of the language employed in the deeds, terms of the local church charters, state statutes governing the holding of church property, and provisions in the constitutions of the general church and of the Maryland and Virginia Eldership concerning the ownership and control of church property. The neutral principles of law analysis is completely secular in its operation. Though it may involve examination of some religious instrument, such as a church constitution, that examination must be performed "in purely secular terms" without relying "on religious precepts in determining whether the document indicates that the parties have intended to create a trust." *Jones v. Wolf,* 443 *U.S.* at 604, 99 *S.Ct.* at 3026, 61 *L.Ed.2d* at 785.

The neutral principles of law approach "free[s] civil courts completely from entanglement in questions of religious doctrine, polity, and practice." *Ibid.* It is a method with which courts are familiar, and contains the "peculiar genius of private-law systems in general—flexibility in ordering private rights and obligations to reflect the intentions of the parties." *Ibid.*

Despite these characteristics, the majority has chosen not to apply the neutral principles of law methodology where a "hierarchical" church is involved. It holds that when a hierarchical organization exists, civil courts must defer to the higher ecclesiastical authority in resolving a property dispute between a local parish and the general church. Both the trial court below and the majority rely on *Watson v. Jones*, 80 *U.S.* (13 Wall.) 679, 20 *L.Ed.* 666 (1872), for this proposition. They assert that *Watson v. Jones* established the rule that the existence of a hierarchical church organization conclusively establishes that a local property dispute must be resolved in favor of the religious doctrine or tenet advocated by the central church. *Watson v. Jones* does not stand for that broad proposition, and, if it did, would violate the Establishment Clause of the First Amendment. In *Watson v. Jones*, the dispute arose within a local church when the central church body, the General Assembly of the Presbyterian Church of the United States, condemned slavery. The majority of the Walnut Street Presbyterian Church of Louisville, the local church, sided with the central body. The dissidents in the congregation did not. The issue presented to the trial court was which set of trustees and elders elected by competing factions of the Walnut Street church should serve the congregation. The matter turned on the power of the General Assembly to prescribe qualifications for local church office and the question presented essentially concerned the extent of a particular church's ecclesiastical authority. In that context the Supreme Court formulated the principle of compulsory deference by courts to decisions of ecclesiastical authorities in hierarchical churches over religious matters which had been committed to them. *Watson v. Jones* did *not* involve the right of a local parish to secede from the central organization, taking its proper-

ty with it. This is the *precise* point which the majority herein misses.

There have been occasions when the resolution of a doctrinal controversy affected control of property. However, in those situations the crucial subject matter in dispute was of an ecclesiastical nature. If the central body has been authorized to decide the ecclesiastical question, its determination would be final and binding on the civil courts. Thus, in *Serbian E. Orthodox Diocese*, suspension and defrockment of a bishop were religious issues to be decided by ecclesiastical and not civil tribunals. Resolution of the religious dispute incidentally determined control of property because the bishop was the principal officer of the corporation which owned the property. However, the Court noted:

> Thus, this case essentially involves not a church property dispute, but a religious dispute the resolution of which under our cases is for ecclesiastical and not civil tribunals. [426 *U.S.* at 709, 96 *S.Ct.* at 2380, 49 *L.Ed.2d* at 163]

In contrast, in *Jones v. Wolf*, the majority of the local parish sought to secede from the general church taking the local property with them. The dissidents who were in the minority sought a judicial declaration of their right to exclusive possession and use of the church property. Thus, the central issue projected was the right of the local church to withdraw its property.[1] By applying neutral principles to resolve the property question, the *Jones v. Wolf* Court recognized that the answer to an underlying but separate ecclesiastical question by a hierarchical body did not foreclose the civil court from resolving the property dispute.

In this case, the core issue concerns control over the property which is in the name of St. Stephen's. The complainants are the Protestant Episcopal Church in the Diocese of New Jersey, its bishop and the Trustees of Church Property of the Diocese. They seek a declaration that all the real and personal property of St. Stephen's is impressed with a trust in favor of the Diocese

---

[1]A secondary question involved resolution of the intrachurch dispute between the two factions in the local church.

of New Jersey.[2]  The plaintiffs claim equitable ownership and control over the property.  The court has not been requested to resolve a dispute between two factions within the St. Stephen's parish.  None of the dissidents in St. Stephen's is a party to this action.  None has intervened.

Contrary to the majority's assertion, the dispute before us is *not* "doctrinal in nature," *ante* at 581, even though it arose as a result of controversies over church doctrine and practice.  None of the plaintiffs, the Diocese of New Jersey, the Trustees of Church Property of the Diocese of New Jersey, and the Bishop of the Diocese, has sought the ouster of the present wardens and vestrymen of St. Stephen's Church.  The plaintiffs do not seek to transfer control of the parish property to a loyal group of parishioners;  nor do they seek to maintain an orthodox parish by appointing a new rector.  The Diocese is seeking to gain control of the property for itself.  Thus, unlike in *Serbian E. Orthodox Church,* upon which the majority relies, the issue before this Court is primarily one of property law:  whether the Diocese has equitable ownership and the right to control the property of St. Stephen's Church.[3]  The type of primarily religious dispute that led to complete judicial deference in *Serbian E. Orthodox Diocese* and *Watson v. Jones* is not present here.[4]

---

[2]The trial court's summary judgment order recited only that control of all property of St. Stephen's be placed in the hands of the Trustees of Church Property of the Diocese and that the Rev. Stanwood E. Graves be evicted from the rectory and enjoined from entering the church or parish house.

[3]See note 2 *supra.*

[4]The arguments made by counsel on the motion for summary judgment, the exhaustive opinion of the trial court, the Appellate Division opinion, and the briefs of counsel have not addressed the problem in terms of the status of defendants as wardens and vestrymen.  This proposition has surfaced for the first time in the majority opinion.  The parties have not been given the opportunity to develop a record or argue that issue.  In *Nieder v. Royal Indemnity Ins. Co.,* 62 *N.J.* 229, 234 (1973), we wrote:

It is a well-settled principle that our appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available "unless the questions so raised on appeal go to the jurisdiction of the trial court or

Even if the question is projected as the majority suggests, namely that when a hierarchical institution exists civil courts must defer to ecclesiastical authority to resolve property disputes, the *Watson v. Jones* rule must be applied consistently with the principles contained in *Jones v. Wolf*. In *Jones v. Wolf*, both the majority and dissent, unlike the majority in this case, recognized that the hierarchical form of the church's organization did not *per se* resolve an intra-church dispute over control of church property.[5]   Since a hierarchy could exist as to

concern matters of great public interest." *Reynolds Offset Co., Inc. v. Summer*, 58 *N.J.Super.* 542, 548 (App.Div.1959), certif. den. 31 *N.J.* 554 (1960).

I do note here, for example, that in connection with this new issue the defendant wardens and vestrymen were duly elected and acting as such when the local parish corporation held its meeting to disaffiliate, that no specific canon has been brought to the court's attention empowering the central church to remove wardens and vestrymen from their offices and declare them vacant.   Even if such a power exists, there is no showing that it has been exercised.   The majority quotes from an affidavit of the Venerable Canon Russell Abbott Smith to the effect that the wardens and vestrymen are not entitled to hold office.   This conclusory statement conflicts with the affidavit of the Senior Warden Donald S. Moore that he continues to have that status and has "never been notified by plaintiffs that they no longer consider me to be one of the wardens of the parish."   See *American Primitive Society v. Pilling*, 24 *N.J.L.* 653 (Sup.Ct.1855), holding that duly elected trustees of the local church corporation did not lose their offices when the congregation voted to disassociate from the central church, that the local church corporation continued to exist, and that the trustees remained in their offices until ousted.   Moreover, the question would remain whether the property placed in the name of the local corporate entity for the membership belongs to the membership when it disaffiliates from the central institution.

[5]A similar recognition may be found in New Jersey opinions which dealt with hierarchical churches.   In *Vargo v. Vajo*, 76 *N.J.Eq.* 161 (Ch.1909), secession was sanctioned where the hierarchical polity applied to ecclesiastical matters but the jurisdiction as disclosed in the church constitution did not "include the management and control of the church property . . . ." *Id.* at 170.   *St. John's Greek Catholic Hungarian Russian Orthodox Church v. Fedak*, 96 *N.J.Super.* 556 (App.Div.1967), certif. den. 50 *N.J.* 406 (1967), held that the parish had never surrendered control over local temporal affairs including the authority to secede.

The comment "Church Property Disputes: The Trend and the Alternative," 31 *Mercer L.Rev.* 559, 575 (1980) ("Church Property Disputes") points out that membership in a hierarchical organization does not neces-

ecclesiastical matters and not as to others, the first question to be addressed according to the *Jones v. Wolf* dissent is, "where within the religious association the rules of polity, accepted by its members before the schism, had placed ultimate authority over the use of the church property." 443 *U.S.* at 618, 99 *S.Ct.* at 3032, 61 *L.Ed.*2d at 794 (Powell, J., dissenting). The object of that inquiry is to determine whether the local church has unreviewable authority to withdraw with its property from the general church. The assumption that a local church has necessarily given up the power to control its property by affiliating with a hierarchical church is unsound. It assumes the existence of a provision to that effect in the agreement that in fact may not exist. Moreover, by not ascertaining who the parties had agreed should decide the question of property control in the event of a schism, the court might effectively contravene the First Amendment. The court might then be compelling, without consent of the owner, the appropriation of its property for use by another for religious purposes. See "Church Property Disputes," 31 *Mercer L.Rev.* at 577.

The majority in *Jones v. Wolf* points out that to ascertain who has the authority to resolve the church property dispute requires an examination of the polity and administration of the church. In some cases this might not be difficult. If the locus of control is ambiguous, however, a careful scrutiny of the constitutions, canons, other documents, past practices and customs, would be necessary. Such searching would constitute an " 'impermissible inquiry into church polity.' " *Jones v. Wolf*, 443 *U.S.* at 605, 99 *S.Ct.* at 3026, 61 *L.Ed.*2d at 786 (quoting *Serbian E. Orthodox Diocese*, 426 *U.S.* at 723, 96 *S.Ct.* at 2387, 49 *L.Ed.*2d at 170). As Justice Brennan wrote in *Md. & Va. Eldership*, 396 *U.S.* at 369–370, 90 *S.Ct.* at 500, 24 *L.Ed.*2d at 584 (concurring opinion) (footnote omitted):

> To permit civil courts to probe deeply enough into the allocation of power within a church so as to decide where religious law places control over the use of

sarily mean that the local church cannot be congregational as far as control of local church property is concerned.

■

church property would violate the First Amendment in much the same manner as civil determination of religious doctrine. Similarly, where the identity of the governing body or bodies that exercise general authority within a church is a matter of substantial controversy, civil courts are not to make the inquiry into religious law and usage that would be essential to the resolution of the controversy. In other words, the use of the Watson approach is consonant with the prohibitions of the First Amendment only if the appropriate church governing body can be determined without the resolution of doctrinal questions and without extensive inquiry into religious polity.

Reliance on *Watson v. Jones* in this case would involve just such an impermissibly extensive inquiry into religious polity.

The parties have not identified any constitutional provisions or canons that address the right of a local parish to withdraw, what happens to its property when that occurs, or who is authorized to resolve a property dispute when a local body secedes. In the absence of clear expressions on these issues a searching inquiry would have to made into the historical practices and rules of the Protestant Episcopal Church in the United States of America and the Protestant Episcopal Church in the Diocese of New Jersey. (In fact, there is sharp disagreement among experts on canon law and church history. One expert testified in the companion St. Mark's case, *Diocese of Newark v. Burns*, 83 *N.J.* 594 (1980), that parishes have the ultimate control and may withdraw their property, while another testified that they may not secede and take their property.) An inquiry of this type and its resolution by a civil court would constitute an " 'establishment of religion' with a vengeance . . . ." *Md. & Va. Eldership v. Sharpsburg Church, Inc.*, 254 *Md.* 162, 175, 254 *A.2d* 162, 170 (Ct.App.1969), dismissed for want of substantial federal question, 396 *U.S.* 367, 90 *S.Ct.* 499, 24 *L.Ed.*2d 582 (1970).

The majority refers to only one canon in support of its position, Title I, Canon 6, Section 3, which provides that no body authorized by civil or canon law to hold real property for any parish shall encumber or alienate the same without the written

consent of the Bishop and Standing Committee of the Diocese.[6] Though indicating a measure of control over the local unit while it is part of the hierarchy, that canon, like other provisions governing a member local unit, would not be effective upon disaffiliation. No reverter or other provision transfers the property to the general church when no longer used in accordance with the doctrine, discipline or worship of the Protestant Episcopal Church in the United States of America. The measure of control embodied in Title I, Canon 6, Section 3, does *not* create an express or an implied trust in favor of the general church.

Likewise, the constitution and canons of the national church and the Diocese disclose nothing which "in purely secular terms" provided that the St. Stephen's property was being held in trust, expressly or impliedly. If anything, the diocesan canons indicate a contrary intent.

Canon 17, Section 3, provides:

> The title to all real estate and endowment funds of a parish receiving financial assistance from the Diocese for the support of the rector in accordance with this canon, unless otherwise directed by the Trustees of the Diocesan Foundation, shall be vested in the Trustees of Church Property of the Diocese of New Jersey, to be held by them in trust until such time as the parish may again be self-supporting.

Canon 21, Section 8, reads:

> The title to real estate, given to or purchased by the Mission for Church purposes, unless otherwise ordered by the Board of Missions, shall be vested in the Trustees of Church Property of the Diocese of New Jersey, to be held by them until such time as the said property may be sold pursuant to Section 6 of Canon 9, or until such time as the Mission shall become duly incorporated as a Parish and admitted into union with the Convention, when the title may be transferred to the Church corporation if it shall so elect. Mission Advancement, Inc. may be authorized by the Trustees of the Diocesan Foundation to acquire, mortgage, sell, lease, or otherwise deal with property for mission purposes.

Canon 37, Section 4, Plan B(2)–Paragraph 4(a), referring to a Parochial Chapel, states:

---

[6] To a similar effect, see *N.J.S.A.* 16:12–4 which, like Title I, Canon 6, Section 3, indicates control over property only while the local unit is part of the general hierarchy.

The title to all real property shall be vested in the Trustees of Church Property of the Diocese of New Jersey.

These three canons exhibit an intent that under some limited circumstances title to property shall be in the central church. They also demonstrate that when property was to be vested in the central church, provisions to that effect were made in clear and unambiguous language. Indeed, absent financial indebtedness to the Diocese, under Canon 17, Section 3, title to all parish real estate is in the local unit. In light of the canons, the power to control the financial and property affairs of the parishes belongs virtually exclusively to the local body.

The Supreme Court in *Jones v. Wolf* suggested:

Through appropriate reversionary clauses and trust provisions, religious societies can specify what is to happen to church property in the event of a particular contingency, or what religious body will determine the ownership in the event of a schism or doctrinal controversy. In this manner, a religious organization can ensure that a dispute over the ownership of church property will be resolved in accord with the desires of the members. [443 *U.S.* at 603, 99 *S.Ct.* at 3025, 61 *L.Ed.*2d at 785]

After this litigation arose and *Jones v. Wolf* was decided, the national church modified Title I, Canon 6, Section 4, to provide that all property of the local church is held in trust for the general church. The church has thereby made it clear that the withdrawing congregation is not entitled to the local church property. This clarity is found by a secular approach and safeguards civil courts from fostering the interests of one religious group over another by engaging in a dialogue of religious dogma or practice in violation of First Amendment principles.

*Jones v. Wolf* recommended that property disputes be settled by neutral principles of law. Completely secular in operation, the method relies on objective, established concepts of trust and property law. The local parishioners of St. Stephen's purchased the land and buildings with their funds. Deeds to the properties have always been in St. Stephen's. St. Stephen's has maintained the property through the years. No trust in favor of the general church can be found when the neutral principles of law are applied to the facts. No instrument expresses that a trust,

express or implied, has been created in favor of the general church. Nothing can be found in St. Stephen's corporate charter and nothing exists in the constitution of the general church creating a trust, express or implied, in favor of the general church. Following the precise instructions in *Jones v. Wolf*, I am satisfied that no trust has been created in the local church property.

This result is fair and just. St. Stephen's was organized as a separate entity by people who believed in the Protestant Episcopal Church. They and their successors advanced the funds to purchase and maintain the land and buildings. St. Stephen's voluntarily joined the Protestant Episcopal Church in the United States of America. It has decided to withdraw from that organization. In the absence of having dedicated its property to that central body or having agreed that someone else would decide in the event of a schism what would happen to its property, it should be permitted to retain that property. Though there had been some disagreement among the congregants (the vote was 44 to 8 to withdraw), the dissenters are not parties to or intervenors in this action and apparently have acceded to the will of the majority. At the time of the motion hearings before the trial court, there were approximately 200 members in the parish, all of whom supported the defendants.

I would reverse and remand.

*For affirmance*—Chief Justice WILENTZ and Justices SULLIVAN, CLIFFORD and POLLOCK—4.

*For reversal and remandment*—Justices PASHMAN, SCHREIBER and HANDLER—3.