**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2157-17T4

ST. CYRILLUS AND METHODIUS
CZECHO SLOVAK NATIONAL
CATHOLIC CHURCH OF PERTH
AMBOY, N.J., INC.,

     Plaintiff-Appellant,

v.

POLISH NATIONAL CATHOLIC
CHURCH, INC., BERNARD J. NOWICKI,
in his official and personal capacity,
and SANTANDER BANK, N.A.,

     Defendants-Respondents.

_____

     Argued March 20, 2019 – Decided April 17, 2020

     Before Judges Fuentes, Accurso and Moynihan.

     On appeal from the Superior Court of New Jersey, Chancery Division, Middlesex County, Docket No. C-000037-17.

     Mario Apuzzo argued the cause for appellant.

     Edwin R. Matthews argued the cause for respondents Polish National Catholic Church, Inc., and Bernard J.

Nowicki (Bourne Noll & Kenyon, attorneys; Edwin R. Matthews, on the brief).

Daniel A. Schleifstein argued the cause for respondent Santander Bank, N.A. (Parker Ibrahim & Berg LLP, attorneys; Scott W. Parker and Daniel A. Schleifstein, on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

Plaintiff St. Cyrillus and Methodius Czecho Slovak National Catholic Church of Perth Amboy, N.J., Inc., (St. Cyrillus) appeals from the order of the Chancery Division, General Equity Part, granting summary judgment in favor of defendants Polish National Catholic Church (PNCC), Bernard J. Nowicki, in his official and personal capacity, and Santander Bank, N.A. Following a fire in October 2013 that destroyed the structure of the St. Cyrillus church, the diocesan bishop assumed control of the local parish and its property, including one million dollars of insurance proceeds. The diocesan bishop based his decision on the parish's financial difficulties and its dwindling number of congregants.

Plaintiff filed this lawsuit to regain control over the church property and the funds to rebuild the church structure that was destroyed by the fire. The trial court granted defendants' motions for summary judgment and held St. Cyrillus

did not have control of the church property and was therefore bound by the PNCC's decision not to rebuild. The motion judge ruled the bishop possesses this discretionary authority under the PNCC constitution. St. Cyrillus also alleged that Santander mishandled the insurance proceeds deposited in its bank account and sought damages for breach of contract and common law negligence. The court also granted Santander's motion for summary judgment and dismissed these claims.

In this appeal, St. Cyrillus argues the trial court erred when it granted defendants' motions for summary judgment and dismissed its claims as a matter of law. We disagree and affirm.

I

Plaintiff incorporated in New Jersey on November 1, 1922. It began to purchase land in this State in 1923 to use for religious purposes. The various deeds in the appellate record show plaintiff purchased the property at issue here in St. Cyrillus's name. On July 20, 1937, the members of St. Cyrillus held a general meeting and decided to join and affiliate with defendant PNCC. In October 1946, representatives of St. Cyrillus attended the PNCC's first Synod, or meeting. The parish journals and copies of Synod minutes produced during discovery show that representatives of the parish attended Synods from October

3

1946 up through and including 2010. To attend these meetings, the representatives had to be a member church of the PNCC.

The parties enjoyed a continuous, uneventful relationship from 1937 until 2004, when plaintiff stopped paying dues to defendant. On October 28, 2013, a fire destroyed plaintiff's church. In its statement of facts in the complaint filed in the Chancery Division, General Equity Part, plaintiff averred it recovered $1,007,264.09 as proceeds from the fire insurance policy. As a part of these proceeds, the carrier issued an emergent advance of $100,000.

Bishop Bernard J. Nowicki, the Bishop Ordinary of the Central Diocese of the PNCC, assumed direct management of St. Cyrillus after the fire. In a certification dated November 1, 2016, Bishop Nowicki averred that the insurance proceeds St. Cyrillus received "would be woefully insufficient with respect to the funds necessary to rebuild the church." He also averred that "[t]here was no plan or discussion about how to raise the additional funds necessary to rebuild the church." He ultimately concluded that St. Cyrillus was not a financially viable parish and lacked the membership base to become financially viable. Under these circumstances, Bishop Nowicki decided not to rebuild the church property.

A-2157-17T4

All the insurance proceeds were deposited in several accounts in Santander. As a customer of the bank, plaintiff entered into a Business Deposit Account Agreement (BDAA), which required Santander to withhold any funds when it was alerted of a dispute concerning who owns and controls the disposition of these funds. Plaintiff alleged that on October 31, 2013, February 6, 2014, and June 9, 2014, it deposited funds into an Account No. -9315. Plaintiff alleged that on June 9, 2014, it transferred $800,000 previously deposited in Account No. -9315 into Account No. -7917, but without authorization from the parish committee.

On June 23, 2014, Mariusz Zochowski, a pastor, Jose Chavez, a member of the parish committee, Bishop Nowicki, and Karen Jarmakowicz completed account maintenance requests changing the authorized access on accounts -9315 and -7917. Plaintiff averred in its verified complaint:

> On July 23, 2014, Church officials executed and delivered a document to Santander Bank regarding access to its bank accounts. The letter concerned two bank accounts: -9315 and -7917. It said that no one could add signers or change signers without the authorization of Mr. Mariusz Zochowski. It ordered that Mr. Zochowski had to be present for any withdrawals. All checks issued from the account had to have two signatories, one of whom had to be Mariusz Zochowski. Finally, it ordered that bank statements be sent to [an address in] Perth Amboy, NJ. Mr. Zochowski was to give a copy of the bank statement to

Jose A. Chavez. The letter was executed by Mariusz Zochowski, Jose A. Chavez, Enriquez Chuquisana, and Johnny F. Garcia Abad.

The funds held in these accounts remained in the custody of the bank and no withdrawals were made during the pendency of the litigation.

II

In its December 5, 2017 order, the Chancery Division, General Equity Part, granted defendants' motions for summary judgment and reaffirmed defendants' control over plaintiff's property and funds. The judge framed the issues before him as follows:

> Assuming for purposes of the motion that the signatories to the Verified Complaint are members of the St. Cyrillus Parish, and therefore have standing to prosecute this action, there remains neither a genuine nor material factual question regarding Plaintiff's membership in the PNCC and that Plaintiff is subject to the authority of the PNCC Constitution.
>
> As a member of the PNCC, the "hierarchical approach" as detailed in Protestant Episcopal Church in the Diocese of New Jersey v. Graves, 83 N.J. 572 (1980), applies and requires the Court to defer to the actions of the PNCC as the higher authority that has the right to maintain control over Plaintiff's property and decide to close the St. Cyrillus Parish.

Plaintiff argues the General Equity Judge erred when he applied the deferential method known as the hierarchical approach to this case. Plaintiff

6

maintains the property dispute should have been decided using the neutral principles of law approach. We disagree.

The United States Supreme Court has allowed states to choose the particular legal framework they deem fit when they are called upon to resolve property disputes of religious organizations. The key is to select a process that does not involve consideration of doctrinal matters. Jones v. Wolf, 443 U.S. 595 (1979). It is well-settled that civil courts may not consider religious doctrinal issues because that consideration would be "wholly inconsistent with the American concept of the relationship between church and state." Presbyterian Church in United States v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church, 393 U.S. 440, 445-46 (1969). Moreover, "[t]he law knows no heresy, and is committed to the support of no dogma, the establishment of no sect." Protestant Episcopal Church in the Diocese of New Jersey v. Graves, 83 N.J. 572, 576 (1980) (quoting Watson v. Jones, 80 U.S. 679 (1872)).

One acceptable method of deciding church property disputes is known as the "neutral principles of law approach." Id. at 578. In using this approach, a court undertakes a "completely secular examination of deeds to the church property, state statutes and existing local and general church constitutions, by-laws, canons, Books of Discipline and the like to determine whether any basis

for a trust in favor of the general church exists." Ibid. If that examination fails to yield any basis to find a trust in favor of the general church, then "more than a mere [hierarchical] relationship between the local and general church must be shown" for the general church to have property rights in the local church's property. Ibid. (citing Wolf, 443 U.S. at 597, 601). However, if the court's examination "of the instruments of ownership would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body." Wolf, 443 U.S. at 604.

Our Supreme Court has endorsed another acceptable process to resolve property disputes affecting religious organizations. Graves, 83 N.J. at 580. First outlined in Watson v. Jones, our state's method is known as the "hierarchical approach." Graves, 83 N.J. at 580. Application of the hierarchical approach requires that when there is "a property dispute between a subordinate local parish and the general church, civil courts must accept the authoritative ruling of the higher authority within the hierarchy." Id. at 577; see also id. at 585 (Schreiber, J., dissenting) (stating Graves holds "that when a hierarchical organization exists, civil courts must defer to the higher ecclesiastical authority in resolving a property dispute between a local parish and the general church"). Indeed, our Supreme Court has clearly stated that "[o]nly where no hierarchical

control is involved, should the neutral principles of law . . . [approach be used]." Id. at 580.

In Graves, the parties asked the Court to settle a dispute over the control of local church property. Id. at 573. There, plaintiffs were the Protestant Episcopal Church in the Diocese of New Jersey. Graves, 83 N.J. at 573. Defendants were St. Stephen's Parish of Plainfield, New Jersey and its rector, wardens, and vestrymen. Ibid. St. Stephen's incorporated in 1895 "as an affiliate member of the Protestant Episcopal Church." Id. at 574. St. Stephen's corporate title made no reference to a larger governing body. Ibid. It owned no property, until 1935, when it purchased its chapel. Ibid. Eventually St. Stephen's obtained more property for a school and parish hall. Ibid. All of these purchases were made with local funds, with no financial assistance from the Protestant Episcopal Church in the Diocese of New Jersey. Graves, 83 N.J. at 574. St. Stephen's deeds ran to its corporation and did not contain any words of trust or reverter in favor of the Protestant Episcopal Church in the Diocese of New Jersey. Ibid.

St. Stephen's admitted it was an affiliate member of the Protestant Episcopal Church in the Diocese of New Jersey and the Protestant Episcopal Church from 1895 until 1976. Ibid. Prior to 1976, the undisputed facts clearly

showed it was an integral part of the hierarchical structure of the Protestant Episcopal Church and the Protestant Episcopal Church in the Diocese of New Jersey. Id. at 575. St. Stephen's adhered "to long-established Protestant Episcopal customs and usages including submission to Diocesan authority." Id. at 574. Furthermore, St. Stephen "used the standard prayer book of the Episcopal Church, and in 1928 accepted" a revision to its prayer book. Ibid. Furthermore, substantial changes in the canons of the Protestant Episcopal Church were followed. Graves, 83 N.J. at 574. St. Stephen's regularly paid annual diocesan assessments and missionary quotas. Ibid. It also regularly sent delegates to the diocesan convention. Ibid.

In 1976, however, because of a doctrinal dispute, St. Stephen's suspended its affiliation with the Protestant Episcopal Church in the Diocese of New Jersey and the Protestant Episcopal Church, withheld payments, and did not participate in diocesan affairs or accept diocesan authority. Id. at 574-75. The dispute was because of, among other things, the ordination of women and changes to the prayer book. Id. at 575.

The Protestant Episcopal Church in the Diocese of New Jersey and the Protestant Episcopal Church sued seeking to prevent a St. Stephen's reverend from conducting services and to restrain St. Stephen's from using its property in

10

any way not sanctioned by the Protestant Episcopal Church in the Diocese of New Jersey.  Id. at 575-76.  After consideration of the facts above, and finding that the dispute was doctrinal in nature, our Supreme Court applied the hierarchical approach.  Graves, 83 N.J. at 580-81.  It found St. Stephen's was an affiliated member of the Protestant Episcopal Church and as such, "the local church organization and its property [were] subject to the hierarchical authority of the parent church as indicated in the constitutions and canon law of the national church and its dioceses."  Id. at 580.  Thus, the plaintiffs in Graves were entitled to the relief sought and were able to prevent the reverend from conducting services and could bar St. Stephen's from using the property in a way not sanctioned by them.  Ibid.

Here, much like the defendant St. Stephen's in Graves, plaintiff St. Cyrillus is an affiliate church of defendant, the PNCC.  This is not contested.  Plaintiff admitted this affiliation as matter of fact in its verified complaint.  Plaintiff does not dispute its status as a subordinate member of the PNCC.  While it is true that St. Cyrillus purchased land and is incorporated in its own name, it is clear St. Cyrillus joined the PNCC on July 20, 1937.  One of St. Cyrillus's pastors confirmed St. Cyrillus was a member of the PNCC and was subject to and abided by all aspects of the PNCC constitution.

11

As a subordinate member, St. Cyrillus is subject to the hierarchical authority of the PNCC. Graves, 83 N.J. at 580. At an October 25, 2014 Central Diocesan Council Meeting, Bishop Nowicki noted he had assumed the pastorate of St. Cyrillus. The Council also voted to dissolve the St. Cyrillus parish and for the diocese to take control of all its funds. The Council's decision is binding on St. Cyrillus as well as this court. Under the hierarchical approach our Supreme Court adopted in Graves, defendant controls plaintiff's property. Because plaintiff admits its affiliation with defendant and there is no question the Council acted to assume control of St. Cyrillus's property, the motion judge properly granted summary judgment on this issue.

An application of the neutral principles of law approach yields the same result. In support of its position, plaintiff argues it only affiliated with the PNCC for "purely religious purposes and not to give it control over its real and personal property which under the PNCC constitution and plaintiff's by-laws always remained with the local church and its members." Plaintiff cites to its by-laws and the 2010 PNCC constitution to support this position. Article IV of plaintiff's by-laws, titled "Administration & Management" reads as follows: "A. [t]he physical property of the parish belongs to the members of the parish who conform to the provisions of the constitution laws, rules, regulations, customs

A-2157-17T4

and usages of the Church."  Plaintiff's by-laws must be read in connection with the PNCC constitution.

Section 3 of Article VI of the 2010 PNCC Constitution states:

> In administrative, managerial and social matters, this Church derives its authority from the people who build, constitute, believe in, support and care for it.  It is a fundamental principle of this Church that all Parish property, whether the same be real, personal, or mixed, is the property of those united with the Parish who build and support this Church and conform to the Rite, Constitution, Principles, Laws, Rules, Regulations, Customs and Usages of this Church.

An isolated reading of Section 3 of Article VI of the PNCC constitution and the by-law quoted above support plaintiff's position that it owns its own property.  However, those sections must be considered in the context of the entire PNCC constitution.  Section 8 of Article V of the 2010 PNCC Constitution states:

> All of the funds, moneys and property, whether real or personal, belong to those members of the Parish who conform to the Rites, Constitution, Principles, Laws, Rules, Regulations, Customs and Usages of this Church, and subject to the provisions of this Constitution and Laws.

Section 10 of Article V states:

> When a Parish is liquidated, expelled, ceases to exist, its Warrant lawfully revoked, or title to its Parish property is unlawfully transferred, then all of its legally

acquired or accumulated funds, moneys and property, whether real or personal, shall revert to the Diocese in which any of the aforesaid events take place, and shall be held in trust by such Diocese for a period of not more than five (5) years for the purpose of reestablishing said Parish or establishing a new Parish within said Diocese; failure to reestablish such Parish or to establish a new Parish within said period of time, the property, whether real or personal, held in trust shall become the property of this Church.

[(Emphasis added).]

Section 11 of Article V states:

Any Parish [that] does not fulfill its financial obligations to the Diocese and to the General Church will come under the direct management of the Diocesan Bishop.

It is undisputed St. Cyrillus did not meet its financial obligations to the Church because it unilaterally stopped paying its dues for multiple years. Because of this, Bishop Nowicki, in his capacity as the Diocesan Bishop, assumed management of the parish. Once he assumed this role, Bishop Nowicki made the decision to close the parish and forgo any plan to construct a new church property. The Council voted to dissolve the parish and take control of its funds. Bishop Nowicki's decision to close the parish and the subsequent dissolution of the parish by the Council caused it to cease to exist under Section 10 of Article V of the PNCC constitution.

A-2157-17T4

When a parish ceases to exist, "all of its legally acquired or accumulated funds, moneys and property, whether real or personal, shall revert to the Diocese." The decision to close the parish was within Bishop Nowicki's authority. Under the 2010 PNCC Constitution, no parish can construct a church without approval from the Diocesan Bishop. There is no question of material fact surrounding the propriety of Bishop Nowicki's actions. The motion judge properly granted summary judgment and correctly entered an order directing defendants to hold plaintiff's funds and property in accordance with the PNCC Constitution. Brill v. Guardian Life Co., 142 N.J. 520, 530 (1995); R. 4:46-2(c).

Plaintiff's remaining arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2157-17T4